LANA KOEPF, ADMINISTRATRIX OF THE ESTATE OF SCOTT
EDWARD KOEPF, DECEASED, APPELLANT, V. COUNTY OF
YORK, STATE OF NEBRASKA, APPELLEE.

251 N. W. 2d 866

Filed March, 23, 1977.   No. 40576.

Vestecka & Gorham and Dennis C. Tegtmeier, for
appellant.

James M. Bausch of Cline, Williams, Wright, John-
son & Oldfather, for appellee.

68

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

WHITE, C. THOMAS, J.

Lana Koepf, administratrix of the estate of Scott Edward Koepf, deceased, brought this action in the District Court for the wrongful death of a minor child, Scott Edward Koepf, against the defendant County of York under the provisions of the Political Subdivisions Tort Claims Act. §§ 23-2401 to 23-2420, R. R. S. 1943. Actions under the Political Subdivisions Tort Claims Act are triable to the court without a jury. At the conclusion of all the evidence in the case, the trial court entered judgment for the defendant. Plaintiff appeals.

On December 7, 1971, the county attorney of York County, Nebraska, filed a petition in the juvenile department in the county court of York County alleging that Scott was a neglected child within the meaning of the juvenile laws of the State of Nebraska. The petition alleges that Scott was born on November 28, 1970, the illegitimate son of the administratrix. The petition prayed that the county court inquire into the alleged neglect of Scott and make such order as might be required. On the filing of the petition, the county judge, Judge Hermann Glock, entered an order directing that the child be taken from the custody of the administratrix by the sheriff and placed in the custody of the York County welfare department, "until such time as the matter is heard." A summons was issued at the same time setting the matter for hearing on the 23rd day of December 1971, at 2 p.m. Pursuant to the order, the sheriff went to the York apartment of Lana Koepf and there took custody of Scott and delivered him to the welfare department of York County. On December 23, 1971, Lana appeared but the matter was continued by Judge Glock until January 4, 1972. On January 4 the hearing was held. The court ordered that the matter be continued until February 8 at 2 p.m. for final determination and further ordered that

the care and custody of Scott be continued in the York County welfare department.

At the time of the placement of Scott with the welfare department, Mrs. Cecelia Grosse, a caseworker, was in charge of the office. The director of welfare was ill at the time. Scott was placed by the welfare department in the home of a Mrs. Thelma Sitzman of York, Nebraska, and remained in her custody until January 21, 1972, when Scott was brought to the York County Hospital. Shortly after his arrival at the hospital he was pronounced dead. The autopsy report found that "death is attributed to subdural and subarchnold hemorrhage with associated cerebral edema. Multiple zones of ecchymosis are noted in the skin of the body, particularly on the face. Thirty-six areas of ecchymosis were noted in the skin of the face alone. There was severe laceration of the mucous membrane of the mouth involving the upper lip and maxillary mucosa in the region of the right central incisor tooth. The pulmonary edema and congestion is considerable (sic) terminal." The evidence establishes that Scott died of the results of severe physical injuries.

The plaintiff alleges that the judge, county attorney, and the sheriff were negligent in removing Scott from Lana's custody on December 7, 1971. It is further alleged that the welfare department was negligent in the selection of Mrs. Thelma Sitzman as a foster parent in (1) not requiring that Mrs. Sitzman be examined by a physician prior to placing Scott in the Sitzman home, (2) not inquiring as to Mrs. Sitzman's attitude toward corporal punishment prior to placing Scott in the Sitzman home, and (3) leaving Scott in the Sitzmans' home after having received complaints about Mrs. Sitzman.

The Political Subdivisions Tort Claims Act, section 23-2401, R. R. S. 1943, removes, to at least a partial extent, the traditional immunity of subdivisions for the negligent acts of their employees and officers.

The question regarding judge's liability has been long settled and clearly established. As a general rule, judges are immune from civil actions for damages for acts performed in the course of their official functions and judicial capacity. Rhodes v. Houston, 202 F. Supp. 624 (D.C. Neb., 1962); Santa Clara v. County of Santa Clara, 1 Cal. App. 3d 493, 81 Cal. Rptr. 643. An exception to the rule of judicial immunity exists. It is founded upon proof that a judge acted in the clear absence of all jurisdiction and where such jurisdictional deficiency was known by the judge when he acted.

The plaintiff does not challenge the good faith of the judge, nor does she offer any evidence in support of such a claim. Rather, she acknowledges jurisdiction by her pleadings. The judge's immunity is patent.

A county attorney "having knowledge of a child in his county who appears to be a child as described in subdivision (1), (2), (3), or (4) of section 43-202 may file with the clerk of the court having jurisdiction in the matter, a petition in writing, setting forth the facts verified by affidavit." § 43-205, R. S. Supp., 1976.

Section 43-202(2), R. S. Supp., 1976, grants exclusive original jurisdiction to county courts or separate juvenile courts of any child under the age of 18 years "whose parent * * * neglects * * * to provide proper or necessary * * * care necessary for the health, morals, or well-being of such child" or "who is in a situation * * * dangerous to life or limb or injurious to the health or morals of such child."

Section 43-206(5), R. S. Supp., 1976, states: "If it appears that the child is in such condition or surroundings * * * the judge may * * * order the officer serving it (summons) to take the child into custody at once."

The information that led to the filing of the petition in the juvenile department in the county court of York County was provided to the county attorney by the

grandmother and aunt of Scott, the plaintiff's mother and sister.

The liability of a political subdivision under the Political Subdivisions Tort Claims Act is not an absolute liability, but consists of such liability as would exist in a private person or corporation without that immunity. § 23-2402, R. R. S. 1943.

Quite apart from the record which fails to disclose any failure by the county attorney to comply with the provisions of sections 43-201 et seq., R. S. Supp., 1976, we are here faced with an assertion of liability of a county where the officer himself is immune.

In Koch v. Grimminger, 192 Neb. 706, 223 N. W. 2d 833, we stated: "* * * that a public prosecutor, acting within the general scope of his official authority in making a determination whether to file a criminal prosecution, is exercising a quasi-judicial * * * function and that where he acts in good faith he is immune from suit for an erroneous or negligent determination."

The plaintiff does not allege that the prosecutor did not act in good faith nor does plaintiff attempt to so prove. The county attorney is personally immune. Strong reasons of policy exist to cloak a prosecutor with such immunity.

"A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could be expected with some frequency, for a defendant will often transform his resentment at being prosecuted into the ascription of improper and malicious actions of the State's advocate. * * * Frequently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation." Imbler v. Pachtman,

424 U. S. 409, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976).

The policy which necessitates the immunity from suit for a prosecutor necessarily requires a similar and possibly extended immunity for the political subdivision of whom the prosecutor may be an employee or officer. If it can be said that the public interest requires a prosecutor not to be constrained in the conduct of the affairs of his office, by threat of suit, then neither should that constraint be placed on the subdivision which hires him or of which he is an officer.

We hold that the Political Subdivisions Tort Claims Act does not extend liability to a subdivision of this state for alleged negligent action of the county attorney in the filing of juvenile petitions.

Similar and equally convincing arguments exist that the sheriff is also immune. A ministerial officer, acting under a process regular and valid on its face issuing from a court or tribunal with apparent jurisdiction to issue the same, is protected in obeying it. See Atwood v. Atwater, 43 Neb. 147, 61 N. W. 574 (1895). The sheriff's act was ministerial in character. He is immune from liability for carrying out those acts. The county of York, of which the sheriff is an officer, is likewise immune for the same reasons set forth above.

Defendant York County asserts that it is immune from suit for alleged negligent acts of the welfare department on two grounds both founded on section 23-2409, R. R. S. 1943: (1) That the claim of the plaintiff arises out of assault and battery; and (2) that the acts of the welfare department are claims based on the exercise or nonexercise of a discretionary function.

The first assertion is demonstrably erroneous. Plaintiff's allegation is not based upon the alleged assault by the foster mother. Instead, it is based upon the alleged negligence of the welfare department in the selection and supervision of the foster home.

The second assertion is also without merit. The "discretionary function" provision has been the sub-

ject of considerable litigation as to which acts of government are discretionary and which are not.

It seems to us that the better rule and one that should be adopted in this state is one that suggests that the discretionary-function exemption extends only to the basic policy decisions and not to ministerial acts arising therefrom. See Indian Towing Co. v. United States, 350 U. S. 61, 76 S. Ct. 122, 100 L. Ed. 48 (1955).

In Elton v. County of Orange, 3 Cal. App. 3d 1053, 84 Cal. Rptr. 27, a minor plaintiff, through her guardian ad litem, brought suit for personal injuries from battering by the operators of a boarding home for neglected and dependent children. The home had been investigated and approved by the defendant State Department of Social Welfare. Defendant demurred on the grounds that the acts of investigation, placement, and supervision were "discretionary acts" and therefore exempt. The provisions of California Government Code section 820.2 provide "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him," regardless of whether the discretion was abused. Section 815.2, Cal. Gov. Code, provides that where the public employee is immune, the public entity is also immune. The trial court sustained the demurrer and the Court of Appeals reversed. The fifth headnote in the case reads: "Decisions for the maintenance, care or supervision of a dependent child, or in connection with the child's placement in a particular home, may entail the exercise of discretion in a literal sense, but such determinations do not achieve the level of basic policy decision and thus do not, under Gov. Code, § 820.2, preclude judicial inquiry into whether negligence of public employees was involved and whether such negligence caused or contributed to injuries received by the child in a boarding home."

The placement in foster homes of defenseless chil-

dren, and the supervision of their health and care, once committed to the custody of the welfare department must be accomplished with the reasonable care commensurate with the circumstances. We hold that a political subdivision of this state can be held liable for a breach of that duty.

In reviewing the decision of the trial court, the following rules are applicable. Under the Political Subdivisions Tort Claims Act, the findings of a District Court under the act will not be disturbed on appeal unless they are clearly wrong. See, Daniels v. Andersen, 195 Neb. 95, 237 N. W. 2d 397 (1975); Buttner v. Omaha P. P. Dist., 193 Neb. 515, 227 N. W. 2d 862 (1975). In determining the sufficiency of the evidence to sustain a judgment, it must be considered in the light most favorable to the successful party. Every controverted fact must be resolved in his favor and he is entitled to the benefit of every inference that can reasonably be deduced from it. See, Daniels v. Andersen, *supra;* Palmer v. Dorn, 196 Neb. 360, 243 N. W. 2d 57 (1976).

In December 1967 the York County department of welfare prepared a foster-home study of the home of Everette and Thelma Sitzman. The study disclosed that Everette Sitzman was partially disabled and a high school graduate. Thelma Sitzman had completed the ninth grade. The Sitzmans had three children who were average students. Due to medical problems and Everette Sitzman's disability, the Sitzmans were ADC recipients. The home was well kept and neat.

There are no published standards used by the welfare department to determine fitness of foster homes other than those of the State Department of Public Welfare. These standards are used by the department to license state foster homes where the children of more than one set of parents reside. The outline was used in the preparation of the Sitzman home study. The Sitzman study, although not extensive, did not in-

dicate any negative attitudes toward children. It did not disclose the Sitzmans' attitude toward corporal punishment.

The Sitzman home was approved for foster-home care and thereafter two children were placed in the home. An 18-month-old boy was in the home from January 11, 1968, to February 26, 1968, and a 6-month-old boy from August 24, 1971, to September 23, 1971. In each case the child did well, improving markedly in health and alertness during the foster-home care. No further foster-home study was made on the Sitzman home.

The director of the welfare department testified that the Sitzmans were, in her opinion, on December 7, 1971, proper foster parents. This opinion was based on the knowledge of the welfare department on home visits from 1966, the foster-home study, and the favorable experience of the two children placed in the home. The welfare director testified that it was not unusual to have unfavorable comments made by members of the public as to selected foster parents and that in nearly all cases of placement, one or more telephone calls would be received concerning the fitness of foster parents by the department.

The first information unfavorable to Mrs. Sitzman came from her sister in February 1968. The sister, Mrs. Joan Sanders, and her daughter, Jennie Emken, told the welfare director that they did not agree with the way in which the foster child then in the home was being cared for. Mrs. Speece, the welfare director, did not rely on that statement as the experience of the department was to the contrary. Mrs. Emken at this same time was interested in foster-home care. After the foster child was returned to his parents, the parents called Mrs. Sitzman as a babysitter.

The next occasion was in August 1971. Again the informant was Jennie Emken. At this visit Mrs. Speece was told that the foster child then in the Sitzman home was not receiving good care and that, in

Mrs. Emken's opinion, Mrs. Sitzman was not emotionally stable. Mrs. Emken again requested consideration for foster-home care. This statement was not credited by Mrs. Grosse, the caseworker. The observation of the child indicated he was receiving adequate care. Mrs. Emken's remarks were attributed to jealousy.

In December 1971 or early January 1972, the caseworker Cecelia Grosse received a call from Mrs. Sanders to tell Mrs. Grosse that Mrs. Sitzman's nerves were bad and that "she does not take proper care of Scottie." Later that same date, the child's grandmother called and informed Mrs. Grosse that in checking around she felt that Mrs. Sitzman was a good person to have Scott. Later on the same day Mrs. Sitzman called the worker to report calls and complaints from the mother and grandmother. Mrs. Sitzman was crying at the time. During the period of time Scott was in the Sitzman home, the caseworker saw him seven times, five times in the home and twice outside the home. She discovered nothing unusual about Scott nor did she notice any bruises or marks.

During the time she had Scott in her home, Mrs. Sitzman was taking seven prescriptive drugs from three separate physicians. The expert testimony suggests the results could have been psychological depression and mental confusion.

The plaintiff testified that at the January 4, 1972, hearing Scott showed bruise marks on his body. This testimony was not verified nor were the bruises noticed by any others at the hearing.

The plaintiff here suggests that the trial court's finding is clearly wrong; that the selection of the foster parents and their supervision was performed negligently; and that the negligence of the welfare department was the proximate cause of Scott's injuries and death.

The most that can be said is that a factual question

was presented. Under our standard of review, the judgment must be affirmed since the trial court's determination was not clearly wrong.

AFFIRMED.