[No. 53376–8.   En Banc.   March 2, 1989.]

RUDOLPH BABCOCK, ET AL, *Appellants,* v. THE STATE OF WASHINGTON, *Respondent.*

*Michael R. Seidl, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Robert J. Crotty,* and *Lukins & Annis,* for appellants.

*Kenneth O. Eikenberry, Attorney General, Owen F. Clarke, Senior Assistant,* and *Michael E. Grant, Assistant,* for respondent.

DORE, J.—We affirm a trial court's grant of summary judgment and its dismissal of all plaintiffs' claims for negligence, alienation of affections and outrageous conduct arising out of the foster placement of four minor girls. Both the State and individual caseworkers for the Department of Social and Health Services are immune from suit. There is no triable issue of outrageous conduct or of alienation of affections.

## FACTS

Rudolph and Ann Long Babcock were married in 1970. Ann was the mother of two children from a prior marriage, Angela Long and Aryn Long. Rudolph and Ann later had

two other daughters, Erika and Beth. Rudolph and all the girls but Aryn are plaintiffs in the present suit.

On August 28, 1978, Ann Babcock, the mother of the four girls, committed suicide. Rudolph was apparently unable to care for the four girls himself, and in July 1981, the Louisiana Department of Health and Human Resources (hereinafter DHHR) obtained an order of dependency mandating their removal from his care and custody. Following a 4–day hearing in July and August 1981, the Louisiana court ordered DHHR to place the girls with the parents of Rudolph Babcock, Willis and Elizabeth Babcock. The elder Babcocks were residents of Richland, Washington, and the court's order directed DHHR to transfer the case to Washington under the interstate compact on the placement of children, codified in this state at RCW 26.34. The girls arrived in Richland approximately 3 weeks later. Rudolph also moved in with his parents.

On October 7, 1981, the Louisiana court ordered Rudolph to leave his parents' home and to reside apart from the girls. He did so, traveling to Wisconsin, where he established a new residence. On the same date, the Louisiana court formally relinquished jurisdiction under the interstate compact on the condition that Washington accept jurisdiction over the case. The juvenile division of Benton County Superior Court accepted jurisdiction on November 5, 1981.

DSHS assigned caseworker Wanda Tyler to the case of the Long and Babcock girls. During October 1981, Aryn Long ran away from the elder Babcocks' home twice. Following these incidents, Tyler placed Aryn in a licensed foster home under the supervision of Marilyn Wallace. Wallace was a secretary at the school attended by the girls. Angela Long asked to be placed in the Wallace home with her sister. Tyler acquiesced, and in December 1981, Angela also moved out of the elder Babcocks' home.

In February 1982 Rudolph Babcock removed his daughters Erika and Beth from his parents' home, taking them to his new home in Wisconsin. DSHS, acting in conjunction with the Prosecuting Attorney for Benton County,

obtained a warrant for Rudolph's arrest on charges of custodial interference and an order of requisition for the Babcock girls. The warrant was later quashed. At a hearing held on April 14, the Wisconsin court granted full faith and credit to the Washington order of requisition and remanded the girls to the custody of Mark Bronson, who had replaced Tyler as the DSHS caseworker responsible for the Long/Babcock case. On April 19, 1982, Erika and Beth returned to Washington.

Meanwhile, following Washington's acceptance of jurisdiction, a dependency disposition hearing under RCW 13.34.110 was held on March 31, 1982, in Benton County Juvenile Court. Rudolph Babcock was represented by counsel at that hearing, and his counsel moved for a continuance of the hearing. The juvenile court granted the continuance as to the Babcock girls, and made a "temporary order" that the Long girls should be transferred to the custody of Lee and Janet Michael. Janet Michael is the sister of the Long girls' natural mother, Ann Long Babcock. Upon the return of the Babcock girls from Wisconsin in late April, they too were placed in the Michael home.

On May 4, 1982 a second hearing was held in the Long/Babcock case. As required by RCW 13.34.120, DSHS submitted a report and recommendation to the juvenile court. In her report, Wanda Tyler recommended that all four girls remain in the custody of the Michaels. Tyler's report also recommended that the court consider reuniting the girls with Rudolph when he could show steady employment and success in psychological counseling. Rudolph Babcock was present at the May 4 hearing and again was represented by counsel. Babcock objected to the recommendation of DSHS on the ground that the Michaels had petitioned the Louisiana court for custody of the girls, and had been refused. Babcock also contended that the Michaels would interfere with his relationship with the girls, making reunification of the family impossible. Finally, Babcock contended that the conditions which led the Louisiana court to declare the girls

in need of care no longer existed. Responding to a question from the bench, Babcock indicated that he was employed. Without taking further evidence, the juvenile court continued the matter on the ground that the record from Louisiana was incomplete. The court ordered that the girls should remain with the Michaels during the continuance.

The next hearing in the matter was heard on August 12, 1982, on Rudolph Babcock's motion to dismiss the girls' dependency cases. The motion was denied.

A third disposition hearing was held on August 26 and 27, 1982. The DSHS offered extensive expert testimony by Maureen Shenker, the Long girls' therapist, and Elaine Adolph, the Babcock girls' therapist. Both experts described their evaluations of the girls, and both expressed the opinion that, to the extent the girls remained troubled, it was probably attributable to their lack of a permanent home. Both experts expressed the opinion that the Michaels were providing a stable, nurturing environment for the girls. Rudolph Babcock was represented by counsel at the hearing, and his attorney cross-examined both experts thoroughly, particularly as to the Michaels' influence over the girls' views of Babcock.

At the August 1982 review hearing, the court also heard testimony from Mark Bronson, the DSHS caseworker responsible for the Long/Babcock matter and a defendant here. Bronson testified that, based on the report prepared for the court under RCW 13.34.120, the DSHS recommended making the Michaels guardians of the Long girls. The attorney for Daniel Long, the girls' father, joined in that recommendation. As to the Babcock girls, the DSHS recommended continued dependency placement with the Michaels on the ground that keeping the sisters together was preferable to attempting to reunite the Babcock girls with their father, especially given residence in another state. Bronson, too, was cross-examined at length by counsel for Rudolph Babcock.

Counsel for Babcock then introduced expert testimony giving a psychological profile of Rudolph and recommending that the Babcock girls should be reunited with their father rather than to remain with the Michaels.

Lee Michael testified on the second day of the August 1982 hearing regarding his relationship with the girls and his hostile relationship with Rudolph Babcock. Babcock's counsel cross-examined him extensively. Janet Michael, the girls' aunt also testified and was also cross-examined by Babcock's counsel.

The court also heard testimony from Rudolph Babcock on the second day of the August hearing. Babcock was examined in regard to his relationship with the Long girls, his stepdaughters. He testified concerning his finances and employment history, his family situation in Wisconsin—he was living with a woman with four children of approximately the same age as his own daughters—the circumstances of his taking Erika and Beth from Washington to Wisconsin without authority and his hostile relationship with Lee Michael. Babcock stated his desire that his daughters be placed in foster care in Wisconsin under the interstate compact.

In closing statements, counsel for DSHS recommended that the Long and Babcock girls remain with the Michaels in a dependency placement under RCW 13.34.130. Guardianship proceedings would be begun in the Long girls' case, but that with regard to the Babcock girls, psychological and home studies of Rudolph Babcock should be commenced in Wisconsin under the interstate compact, with a view toward reuniting the Babcock girls with their father.

Counsel for Rudolph Babcock asked the court to turn all four girls over to the jurisdiction of Wisconsin under the interstate compact, where they would remain in foster care until they could be reunited with Rudolph by the courts of that state.

The juvenile court ordered that all four girls should remain with the Michaels, but that the Babcock girls

should be reunited with their father as soon as positive psychological and home studies could be completed and submitted.

On November 2, 1982, following the receipt of the Wisconsin reports, a review hearing under RCW 13.34.130 was held as to the Babcock girls alone. The Wisconsin caseworker reported that, because of insufficient information, she could not make a recommendation regarding Rudolph Babcock. The court heard argument of counsel, including counsel for Babcock, and ordered that, because of the inconclusive report, no final action could be taken. The Babcock girls therefore remained in the Michaels' care.

On November 11, 1982, Babcock moved for the transfer of his daughters to Wisconsin. No further information had been received from Wisconsin and Wisconsin had not agreed to accept jurisdiction under the interstate compact. The court heard arguments of counsel, including counsel for Babcock, and denied the motion.

On December 16, 1982, the juvenile court heard a second motion by Babcock for the placement of Erika and Beth in foster care in Wisconsin. Wisconsin's position on the matter remained unchanged. The court heard argument and explanations from counsel regarding the inability of the Wisconsin authorities to complete a successful home study of Babcock. Counsel for Babcock offered the testimony of Erika and Beth regarding their experience living with Rudolph in Wisconsin, and the court apparently heard that testimony in camera. Supplemental Clerk's Papers, at 203–04. The court heard testimony of Suzanne Reinicke, the mother of four with whom Rudolph Babcock was then living in Wisconsin. Reinicke testified concerning the home in Wisconsin and the period during which Erika and Beth had lived with Babcock there. The court denied the motion.

On December 28, 1982 Babcock again renewed his motion for the return of his daughters. Given that no new circumstances were presented, the court denied the motion. The Babcock girls remained in the Michael home.

The juvenile court held another review hearing on the Babcock girl's case on March 7, 1983. Home study and psychological reports from Wisconsin were received in evidence and again were inconclusive. The court therefore accepted DSHS's recommendation that the girls remain with the Michaels, again pending a successful home study and psychological evaluation of Rudolph Babcock.

In early 1983, Babcock moved from Wisconsin to Oklahoma, and on September 21, 1983 the juvenile court heard a motion by Babcock to place the Babcock girls in foster care in Oklahoma. The court heard extensive testimony from Rudolph Babcock concerning his move, his employment, his relationship with Reinicke and the reasons for the Wisconsin authorities to complete the home study the court had requested in May 1982. The court also heard testimony from Reinicke. Lee Michael was also called to testify as to his continuing custody of the girls and his continuing hostile relations with Babcock. The court denied Babcock's motion on the ground that it lacked a complete and positive home study from Oklahoma or Wisconsin and because the relationship between the girls and their aunt and uncle appeared to be positive.

> Now there are a couple of young ladies involved here. Their best interest is my main purpose in being here. And they are being well cared for. And there is a certain bonding between them and the aunt and uncle. And for me to, in a vacuum just order those kids to a strange state and a strange environment, I would be out of my mind to do that, without knowing that their welfare was, in the future, very, very bright.

Supplemental Clerk's Papers, at 304–05.

The Long and Babcock girls remained in the Michael home until October 1983, when it was discovered that Lee Michael had sexually abused all four girls, in addition to his own daughter. Michael was arrested and subsequently convicted on three counts of statutory rape and two counts of

indecent liberties. He is presently serving a 55–year sentence.[1]

At the time he was awarded custody of the four girls on the recommendation of DSHS, Lee Michael had a substantial criminal record, which included charges of forcible rape, attempted rape and sexual assault. The DSHS admits that had it discovered this criminal record, it would *not* have recommended placing the girls in the Michael home. Clerk's Papers, at 3363.

The DSHS recommendation was based on a single home study conducted by Tyler in November 1981. Tyler testified in her deposition that the purpose of the study was not to evaluate the Michaels as adoptive parents, but only as foster parents. In conducting her evaluation, however, Tyler used the home evaluation checklist on a form entitled "Adoption Application." The checklist includes the question "Have you ever been convicted of a crime?" Tyler did not ask that question, thereby failing to discover Lee Michael's criminal record. Tyler conducted no other investigation which would have or did reveal that record.

Based on Tyler's and DSHS's failure in this regard, Rudolph, Willis and Elizabeth Babcock, Angela Long and Beth and Erika Babcock filed identical suits in state and federal court alleging negligence, the tort of outrage, alienation of affections and the violation of federal civil rights under color of state law, 42 U.S.C. § 1983.

The federal court at first denied the defendants' motion for abstention under the doctrine enunciated in *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800,

---

[1]Following the departure of Lee Michael, the Long and Babcock girls asked to be allowed to continue living with Janet Michael. They were permitted to do so. In December 1983, following a successful home study, the two Babcock girls were returned to the custody of Rudolph, who had moved to Oklahoma. Aryn and Angela Long continued in the custody of Janet Michael until they reached the age of majority.

47 L. Ed. 2d 483, 96 S. Ct. 1236 (1976). However, the federal court later reversed itself, sua sponte, and dismissed the claims of the father and daughters without prejudice. The grandparents' claims were dismissed with prejudice.

On October 1, 1986 Benton County Superior Court granted defendants summary judgment on all plaintiffs' claims. Subsequently, the federal court again revised its order, reinstating the case of the father and daughters, but staying federal proceedings pending the outcome of this state court suit. On April 20, 1986, the federal court lifted its stay as to the section 1983 claims of the father and daughters.

As a consequence, the parties do not appeal the Superior Court's dismissal of the section 1983 claims asserted in state court. This case concerns only the claims for negligence, alienation of affections and outrageous conduct.

## PLAINTIFFS' CLAIMS ARE NOT BARRED
### BY RES JUDICATA

The State contends that the plaintiffs' claims are precluded under the doctrine of res judicata, because they are "no more than a thinly veiled attempt to relitigate facts and issues previously litigated in the Benton County Juvenile Court." Brief of Respondent, at 15–16. The trial court accepted this argument, but it erred in doing so. Res judicata is inapplicable here.

The State fails to distinguish between claim preclusion and issue preclusion in its brief, or to specify which sort of preclusion it thinks is required here. We explained the difference in our recent decision in *Shoemaker v. Bremerton*, 109 Wn.2d 504, 507, 745 P.2d 858 (1987).

> The general term res judicata encompasses claim preclusion (often itself called res judicata) and issue preclusion, also known as collateral estoppel. Under the former a plaintiff is not allowed to recast his claim under a different theory and sue again. Where a plaintiff's second claim clearly is a new, distinct claim, it is still possible that an individual issue will be precluded in the second action under the doctrine of collateral estoppel or issue

preclusion. In an instance of claim preclusion, all issues which might have been raised and determined are precluded. In the case of issue preclusion, only those issues actually litigated and necessarily determined are precluded.

Claim preclusion is proper only when the later suit presents the same claim as the earlier suit. For example, in *Sanwick v. Puget Sound Title Ins. Co.*, 70 Wn.2d 438, 441, 423 P.2d 624, 38 A.L.R.3d 315 (1967), the plaintiff sued first for specific performance and then for damages under the same contract. The second suit was dismissed on the ground that the plaintiff had improperly split his claim. The doctrine of claim preclusion prohibits claim splitting as a matter of policy, primarily in order to conserve judicial resources and to ensure repose for parties who have already responded adequately to the plaintiff's claims. The key inquiry is whether the second suit does indeed present the same claim as the first. We have stated the standard for that determination as follows:

> (1) [W]hether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.

*Norco Constr., Inc. v. King Cy.*, 106 Wn.2d 290, 294, 721 P.2d 511 (1986).

Claim preclusion obviously is not appropriate here. Perhaps the juvenile court proceedings and the plaintiffs' claims arise out of the same nucleus of fact, but it would be absurd to contend that the plaintiffs seek to affect rights established by the juvenile court or that the juvenile court was in any way concerned with the infringement of the rights on which plaintiffs' present claims are based. Most of all, it is impossible to see how the two actions could possibly involve the same body of evidence when the plaintiffs' present claims are based primarily on the fact that key evidence was omitted, allegedly through the fault of DSHS, at

the juvenile court proceedings. Claim preclusion is therefore not called for.

The State is no more entitled to collateral estoppel. The theory behind collateral estoppel is that, even where claim preclusion is not proper, the two claims of the plaintiff may involve common issues of fact. Under the doctrine of collateral estoppel, or issue preclusion, those individual issues will not be relitigated. The requirements for collateral estoppel are: (1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; (4) the issue to be precluded must have been actually litigated and necessarily determined in the prior action; and (5) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied. *Shoemaker,* at 507–08.

Since the State has not specified which issues it thinks are precluded by the juvenile court proceedings, it is difficult to apply the test. On the record we have, however, it is clear the requirements for collateral estoppel are not met. The only issues actually determined by the juvenile court at any of the many hearings held in the Long/Babcock cases were those set forth in RCW 13.34.130, which governs the disposition of children found to be dependent and in need of care. None of those issues is identical to the issues raised by the plaintiffs' claims for negligence, alienation or outrage. Therefore, no issues in this case are precluded under the doctrine of collateral estoppel.

## THE INDIVIDUAL DEFENDANTS ARE ABSOLUTELY IMMUNE FROM SUIT

We hold that the individual defendants are entitled to absolute immunity from suit on the ground that the acts complained of occurred in the course of judicial proceedings prescribed by statute. The gravamen of the plaintiffs' complaint for negligence is that the defendants failed to inform the juvenile court of Lee Michael's criminal record, as a

result of which the girls were placed in his home, where they suffered great harm. As the plaintiffs present the facts, the placement decision was made by DSHS with the juvenile court acting solely on the Department's recommendation, more or less as a rubber stamp. As the statement of facts above demonstrates, however, just the opposite is true. The decision to place the girls in the Michael home was not made by DSHS, but by the juvenile court. It would be manifestly unjust to hold the caseworkers liable for a decision of the court which was beyond their control.

The plaintiffs contend that the mere fact that a judicial order intervened should not insulate the caseworkers and the State from liability for their omissions in the investigation of the Michaels. There are two reasons why this is not so. First, the report of DSHS, whatever its faults, was only one part of the body of evidence considered by the court in placing the girls with the Michaels and in permitting them to remain there over so many months. A large body of evidence was heard in the course of a number of separate hearings. It included the testimony of experts who had examined the girls as well as family members including Rudolph Babcock and Lee Michael himself. The court was willing from the first to return the Babcock girls to their father, but was unable to do so because it never received information sufficient under RCW 13.34.130 to permit it to do so. On the record we have, we can say as a matter of law that the report of the DSHS workers was not the proximate cause of the injury complained of.

We need not even reach the proximate cause issue, however, because the caseworkers are absolutely immune from suit. Their immunity rests on their status as participants in the hearings conducted in this case as required under RCW 13.34.110. It is well established that the participants in adversarial judicial proceedings are entitled to absolute immunity as a safeguard on the integrity of such proceedings.

## A. Immunity for Participants in Adversarial Judicial Proceedings

The caseworkers' role in this matter was established by the Legislature in setting up procedures to govern the disposition of dependent children. RCW 13.34.110 mandates a fact–finding hearing on the dependency petition to be followed by a separate hearing on the dependent child's disposition. The initial dependency hearing in this case took place in Louisiana. The disposition hearing was held, after two continuances, on August 26 and 27, 1982. The DSHS's role in the disposition hearing is specified in RCW 13.34-.120:

(1) To aid the court in its decision on disposition, a social study, consisting of a written evaluation of matters relevant to the disposition of the case, shall be made by the person or agency filing the petition. The study shall include all social records and may also include facts relating to the child's cultural heritage, and shall be made available to the court. The court shall consider the social file and social study at the disposition hearing in addition to evidence produced at the fact–finding hearing. At least ten working days before the disposition hearing, the department shall mail to the parent and his or her attorney a copy of the agency's social study and proposed service plan, which shall be in writing or in a form understandable to the parents or custodians. In addition, the department shall provide an opportunity for parents to review and comment on the plan at the community service office. If the parents disagree with the agency's plan or any part thereof, the parents shall submit to the court at least twenty–four hours before the hearing, in writing, or signed oral statement, an alternative plan to correct the problems which led to the finding of dependency. This section shall not interfere with the right of the parents or custodians to submit oral arguments regarding the disposition plan at the hearing.

(2) In addition to the requirements set forth in subsection (1) of this section, a predisposition study to the court in cases of dependency alleged pursuant to RCW 13.34.030(2) (b) or (c) shall contain the following information:

(a) A statement of the specific harm or harms to the child that intervention is designed to alleviate;

(b) A description of the specific programs, for both the parents and child, that are needed in order to prevent serious harm to the child; the reasons why such programs are likely to be useful; the availability of any proposed services; and the agency's overall plan for ensuring that the services will be delivered;

(c) If removal is recommended, a full description of the reasons why the child cannot be protected adequately in the home, including a description of any previous efforts to work with the parents and the child in the home; the in-home treatment programs which have been considered and rejected; and the parents' attitude toward placement of the child;

(d) A statement of the likely harms the child will suffer as a result of removal. This section should include an exploration of the nature of the parent–child attachment and the meaning of separation and loss to both the parents and the child;

(e) A description of the steps that will be taken to minimize harm to the child that may result if separation occurs; and

(f) Behavior that will be expected before determination that supervision of the family or placement is no longer necessary.

At the August hearing Mark Bronson testified for DSHS, based on the report prepared by Wanda Tyler.

██ The fact that the caseworkers acted as participants in an adversary hearing renders their actions immune under the common law doctrine of absolute immunity for participants in judicial proceedings. This immunity is well described by the United States Supreme Court in the cases *Imbler v. Pachtman,* 424 U.S. 409, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976), *Butz v. Economou,* 438 U.S. 478, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978) and *Briscoe v. LaHue,* 460 U.S. 325, 75 L. Ed. 2d 96, 103 S. Ct. 1108 (1983).[2]

---

[2]All three of these cases—*Imbler, Butz* and *Briscoe*—were federal suits based on 42 U.S.C. § 1983, which authorizes suit in federal and state court for injuries inflicted by state officials under color of state law. As noted, these plaintiffs' claims under section 1983 are not before us. However, the immunities recognized

The defendants contend that these cases establish two separate grounds of immunity. First, social services caseworkers are said to be entitled to quasi–prosecutorial immunity because a caseworker's role in dependency proceedings under RCW 13.34 is analogous to that of a prosecutor in criminal proceedings. Second, the defendants argue that the caseworkers are entitled to immunity as witnesses. The defendants are almost correct. The leading cases actually set forth a single theory of immunity: that participants in adversarial judicial proceedings are immune from suit as a safeguard on the integrity of the adversarial process itself.

In *Imbler,* the plaintiff alleged that a state prosecuting attorney had knowingly used false evidence and had suppressed exonerating evidence at his trial for felony murder. The Court held the prosecutor immune from suit under section 1983 on the ground that prosecutorial immunity at common law was incorporated into the Civil Rights Act by Congress.[3] That common law immunity has several grounds. There is the effect on the prosecutor himself: civil suits would distract him from the business of his office. There is also a question of efficiency, in that the civil suit would require a virtual retrial of the criminal case. Above all, however, prosecutorial immunity is required to preserve the truth–finding function of the criminal trial. The threat of liability to suit would have a chilling effect on the initiation of criminal prosecutions and on the prosecutor's conduct at trial. The jury's function might be impaired by a prosecutor's decision to withhold evidence that is relevant but not ironclad. Finally, the judgment of those responsible

in *Imbler, Butz* and *Briscoe* were all founded on common law. The immunities and the logic behind them are, therefore, equally applicable to the plaintiffs' tort claims.

[3]The Court had previously recognized such incorporated immunity for legislators in *Tenney v. Brandhove,* 341 U.S. 367, 95 L. Ed. 1019, 71 S. Ct. 783 (1951) and for judges in *Pierson v. Ray,* 386 U.S. 547, 18 L. Ed. 2d 288, 87 S. Ct. 1213 (1967).

for evaluating the fairness of the trial on appeal and collateral review might be biased by the knowledge that a favorable decision for the prisoner could subject the prosecutor to liability.

The important thing to notice about the *Imbler* case is that it bases prosecutorial immunity on the nature of the criminal proceeding; *not* on the nature of the prosecutor's duties. The Court reinforced this point in its opinion recognizing "quasi–prosecutorial" immunity in *Butz*. The plaintiff in *Butz* sued officials of the Department of Agriculture for their initiation and conduct of an adversarial administrative hearing related to his status as a commodities broker. The Court held that the hearing examiner and administrative law judge were entitled to absolute immunity.[4]

*Butz*'s grant of immunity to the two officials was based on the resemblance between the adversarial administrative hearing and a criminal trial. *Butz,* at 512–13. The hearing officer and administrative law judge in *Butz* were *not* held immune because of their resemblance to a prosecutor and trial judge. The critical fact was that they were participants in an adversarial proceeding in need of the same safeguards as a criminal trial. Justice White's opinion stresses that the prosecutorial immunity recognized in *Imbler* is based on the prosecutor's status as one of "the various participants in judge–supervised trials," a group which includes judges, grand jurors, petit jurors and witnesses. *Butz,* at 509–12. He discusses the features of a criminal trial stressed in *Imbler* and also several others which justify immunity for the various participants in any adversarial proceeding. First, immunity serves the system's interest in finality.

> The cluster of immunities protecting the various participants in judge–supervised trials stems from the characteristics of the judicial process . . . [C]ontroversies

---

[4]The Court rejected the contention that the Secretary and Assistant Secretary of the Department were entitled to absolute immunity.

sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus. Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.

(Citations omitted.) *Butz,* at 512. Second, a variety of features of adversary proceedings make civil suits based on their conduct unnecessary or redundant.

[T]he safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross–examination . . . and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.

(Footnote omitted.) *Butz,* at 512. Since these considerations are equally present in criminal trials and administrative hearings, the Court recognized immunity for the hearing officer and administrative law judge.

In *Briscoe,* the Court considered whether witnesses are entitled to immunity in section 1983 suits. Given the logic of *Imbler* and *Butz,* the Court had no difficulty in determining that they are. As the Court noted in discussing *Imbler* and *Butz*: "The central focus of our analysis has been the nature of the judicial proceeding itself." *Briscoe,* at 334. Witnesses, the Court held, are entitled to immunity for the sake of the adversary process.

In the words of one 19th–century court, in damages suits against witnesses, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth

should be left as free and unobstructed as possible." *Calkins v. Sumner,* 13 Wis. 193, 197 (1860). A witness' apprehension of subsequent damages liability might induce two forms of self–censorship. First, witnesses might be reluctant to come forward to testify. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability.

(Citations omitted.) *Briscoe,* at 332–33.

Based on *Imbler* and progeny, a number of courts have recognized immunity for social services workers in cases similar to this one, based on their role in judicial proceedings. *See Meyers v. Contra Costa Cy. Dep't of Social Servs.,* 812 F.2d 1154 (9th Cir 1987); *Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir. 1984); *Hennessey v. State,* 627 F. Supp. 137 (E.D. Wash. 1985); *Whelehan v. County of Monroe,* 558 F. Supp. 1093 (W.D.N.Y. 1983).

B. The Defendants in This Case Are Immune

█ In deciding whether immunity is appropriate in this case, the question is whether the proceedings established for dependency cases by RCW 13.34 are adversarial proceedings in need of the same sort of protection recognized as a necessity in *Imbler, Butz* and *Briscoe.* It should be apparent from the proceedings actually conducted in this case that they are, particularly where the report and recommendation of DSHS is concerned. First, the report of DSHS cannot be received in a fact–finding or disposition hearing "except as otherwise admissible under the rules of evidence." RCW 13.34.110. Second, the Department is required to make its report and recommendation available to parents of dependent children, and the Legislature has stipulated that: "This section [relating to the Department's report] shall not interfere with the right of the parents or custodians to submit oral arguments regarding the disposition plan at the hearing." RCW 13.34.120. In the August 1982 hearing, Rudolph Babcock was represented by counsel who vigorously cross–examined Mark Bronson, the DSHS witness who presented the report to the court. Babcock's counsel was given a full opportunity to argue that the court

should disregard the DSHS report and recommendations and he did so. In all the hearings conducted in this matter, all parties had a full opportunity to offer evidence, cross–examine and argue to the court and those opportunities were fully exploited. The proceedings here were fully adversarial, as contemplated by the Legislature.

Under the logic of *Imbler* and progeny, therefore, immunity for DSHS caseworkers acting in dependency proceedings is required. First, although it was not a consideration here, the threat of subsequent civil suits would surely cause Department employees to fail to initiate dependency proceedings in cases where they otherwise would do so. In this the caseworkers resemble prosecutors, but note that what matters is not the nature of the officials, but the nature of the proceedings. Without immunity for DSHS caseworkers, the adversarial character of dependency proceedings would suffer in the same way that criminal trials would suffer if prosecutors were threatened with liability: the cases would never be brought.

Second, immunity is required to protect the caseworkers in their role as witnesses. This too bears on the adversarial nature of dependency proceedings. The Department is required to submit a broad range of information to the juvenile court under RCW 13.34.120. It does so in both written reports and in testimony before the court. Without immunity, caseworkers may well hold back critical information needed by the court in order to render a proper decision. In adversarial dependency proceedings, this might lead the court not to declare dependency where it would in fact be in the best interests of the child, because DSHS has not been able to do the vigorous job that RCW 13.34.120 contemplates.

Third, the adversarial nature of dependency proceedings renders subsequent civil proceedings unnecessary as a check on the fairness or thoroughness of the dependency process or DSHS itself. Despite the tragic outcome in this

case, the fact remains that, to the best of the judiciary's ability, the rights and interests of all participants were fully protected in the dependency proceedings. The Babcocks, as adversary parties, had every opportunity of notice, cross examination and argument to challenge the DSHS within the dependency proceeding and to expose the shortcomings of the Department's report. Permitting a second contest over the same matter would have no deterrent or encouraging effect on the Department not already provided by the adversarial nature of the dependency proceeding itself.

Fourth, as a related matter, it is obvious that this dependency matter was fought out in repeated, and redundant, hearings over the course of many months. For the sake of finality of judicial decisions and for the sake of efficiency of the judicial process, the matter should rest there. The civil suit contemplated by the plaintiffs here is not barred by the strict rule of res judicata, but the redundancy and expense of such suits is certainly a significant factor favoring the grant of immunity to Department caseworkers.

Therefore, we hold that caseworkers carrying out their statutory duties in connection with dependency proceedings under RCW 13.34 are entitled to immunity from subsequent suit, on the ground that such immunity is required to preserve the integrity of that adversarial process.

### C. The Scope of the Caseworkers' Immunity

The scope of the caseworkers' immunity must extend to the full range of their duties under RCW 13.34. The aim of the entire process is to inform the court as to the course of action in the best interests of the child. The threat of liability is equally damaging to the adversarial process whether liability is imposed for preparing the report or for testifying on the basis of the report in court. In this case for example, Mark Bronson testified on the basis of a report prepared by Wanda Tyler. What would be the logic or justice in granting Bronson immunity, on the ground that he

was an actual courtroom witness, while denying immunity to Tyler because she was not? If liability is imposed on either task, the court's supply of information in the dependency process will be diminished. The fact is that all the duties set forth in RCW 13.34.120 are directly related to the adversary proceedings mandated in RCW 13.34.110. Immunity must extend to all such functions, or it is meaningless.

The dissent argues that certain courts have found child welfare agencies liable for negligent placement. Dissent, at 112. That argument has no weight here. First, applying those cases would require us to distinguish between the caseworker's actions in removing the child from the home and his actions in placing the child in dependent care. However, removal is not an issue in this case because the initial declaration that the girls were dependent and in need of care was made in Louisiana, on the recommendation of that state's DHHR. The question here is whether the caseworkers' role in the adversarial dependency proceedings conducted under RCW 13.34.110 entitles them to immunity. As to that, there is no basis for distinguishing between the removal and the placement of the child. Both decisions are in the hands of the court, first in the fact–finding hearing and then in the hearing on disposition. As to both removal and placement, the Department functions in the same advisory role, preparing a single report containing a single recommended plan of action. The need for immunity based on the integrity of the adversarial proceeding is the same in regard to both removal and placement.

Second, the cases the dissent cites for its rule are irrelevant to its argument. Those cases concern the discretionary function exception to the waiver of sovereign immunity. That theory of immunity is not an issue here. *See infra,* at 105–06. The dissent's reliance on these cases indicates a failure to grasp the logic of that immunity as explained in *Imbler, Butz* and *Briscoe.* The immunity of the caseworkers must extend to the full range of their statutory duties.

## THE STATE IS IMMUNE ON THE SAME GROUND
### AS THE INDIVIDUALS

The State is immune to the same extent as its agents because the caseworkers' defense of immunity is not a personal one, but rather relates directly to their role as agents of the State.

As a preliminary matter, we note that the State has no general defense of sovereign immunity, since it was abolished in this State by RCW 4.96.010. That statute which provides that the State and its officers:

shall be liable for damages arising out of their tortious conduct . . . to the same extent as if they were a private person or corporation . . .

One exception to RCW 4.96.010 which this court has recognized is the "discretionary function" exception, under which state officials engaged in the formulation of public policy are immune from suits based on basic policy determinations. *Chambers–Castanes v. King Cy.*, 100 Wn.2d 275, 669 P.2d 451, 39 A.L.R.4th 671 (1983). However, it would stretch that doctrine well past its limit to say that the social workers involved here were engaged in the formulation of basic policy. Therefore, the "discretionary function" exception to the abolition of sovereign immunity does not apply here, as many other courts have held in similar suits. *See National Bank v. Leir*, 325 N.W.2d 845 (S.D. 1982); *Koepf v. County of York*, 198 Neb. 67, 251 N.W.2d 866, 90 A.L.R.3d 1205 (1977); *Little v. State Div. of Family Servs.*, 667 P.2d 49 (Utah 1983); *Elton v. County of Orange*, 3 Cal. App. 3d 1053, 84 Cal. Rptr. 27 (1970); *Bartels v. County of Westchester*, 76 A.D.2d 517, 429 N.Y.S.2d 906 (1980).

According to the very terms of RCW 4.96.010, however, the State still is not liable here. The State is liable only to the extent a private defendant in a similar situation would be. The State acted in this case only through the caseworkers. As principal, the State may be liable for those agents' actions under the doctrine of respondeat superior. However, like any principal, the State may take advantage

of the defenses of its agent to the extent those defenses are not purely personal to that agent. *Vern J. Oja & Assocs. v. Washington Park Towers, Inc.*, 89 Wn.2d 72, 77, 569 P.2d 1141 (1977).

The defense of immunity asserted by the caseworkers here is not a personal defense. On the contrary, it is intimately related to their status as agents of the State. The whole theory behind the immunity we recognize here is to permit DSHS caseworkers to more effectively carry out their statutory duties under RCW 13.34.120. The State is therefore equally entitled to assert the same defense.

This is no more than common sense. Suppose the caseworkers were immune but the State were not. The grant of immunity would enable the caseworkers to pursue their statutory duties without the adverse effects associated with the threat of liability, as discussed above. However, if the State were not similarly immune, the restraints on the caseworkers and the consequent constraints on the flow of information to the juvenile court would be imposed as a matter of Department policy. Nothing is gained by holding the individuals immune if the State is not also immune.

Therefore, we affirm the trial court in its grant of summary judgment to the State as well as to the individual defendants.

## THERE IS NO TRIABLE ISSUE OF OUTRAGEOUS CONDUCT

The plaintiffs' claims for outrage appear to relate to conduct within the scope of RCW 13.34.120 and therefore within the scope of absolute immunity. Even to the extent that claim may rest on conduct outside the bounds of immunity, however, summary judgment was appropriate. Nothing in the record indicates a triable issue of outrageous conduct.

The dispositive case is *Guffey v. State*, 103 Wn.2d 144, 690 P.2d 1163 (1984), in which we considered a claim of outrage against a state trooper who, on the basis of a radio report, believed the plaintiff to be a wanted felon.

The trooper drew his weapon, ordered the plaintiff out of his car and subjected him to a pat–down search. The plaintiff was not the wanted man. This court held that, as a matter of law, the trooper's conduct was not "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Guffey*, at 146 (quoting *Grimsby v. Samson*, 85 Wn.2d 52, 530 P.2d 291, 77 A.L.R.3d 436 (1975)).

We must reach the same conclusion here. The caseworkers, of course, had nothing to do with the rape of the girls. Their only offense was to fail to discover it. We can find nothing else in the record which remotely approaches even the trooper's conduct in *Guffey*. Like the trooper, the caseworkers were merely fulfilling their duties as public servants. If the trooper's conduct is not outrageous, as a matter of law, then the caseworker's conduct certainly is not. We therefore affirm the trial court's grant of summary judgment.

### THERE IS NO TRIABLE ISSUE OF ALIENATION OF AFFECTIONS

Like the plaintiff's claims for outrage, the Babcock's claims for alienation of the girls affections probably fall within the scope of the defendants' immunity. We nevertheless will discuss briefly the merits.

This court has not yet had occasion to recognize a cause of action for the alienation of a child's affection, nor for the alienation of a grandchild's affection. As guidance in considering such claims, however, courts of this state have repeatedly relied on the opinion in *Strode v. Gleason*, 9 Wn. App. 13, 510 P.2d 250, 60 A.L.R.3d 924 (1973) (Callow, J.). *Strode* states the elements as: (1) an existing family relationship; (2) a malicious interference with the relationship by a third person; (3) an intention on the part of the third person that such malicious interference results in a loss of affection or family association; (4) a causal connection between the third parties' conduct and the loss of

affection; and (5) resulting damages. *Strode,* at 14–15, 20. "Malicious interference" refers to unjustifiable interference. *Strode,* at 20.

Whatever interference in the parent–child relationship occurred here, it cannot possibly be said to be malicious or unjustifiable. The defendants were acting under the authority of law in what was necessarily a complex and emotionally charged case. As a matter of law, it is not possible for the plaintiffs to establish that the caseworkers acted with malice. Furthermore, as a matter of law, the plaintiffs could not establish that the actions of the caseworkers were the cause of any loss of affection. Confusion on the part of the girls as to where their true affections lay was, unfortunately, almost inevitable from the moment Louisiana began its dependency proceedings. To lay that at the door of the caseworkers would be unjust.

## CONCLUSION

The individual defendants and the State are immune on the ground that they were participants in an adversary dependency proceeding. There is no triable issue of either outrage or alienation of affections. We therefore affirm the grant of summary judgment as to all claims.

CALLOW, C.J., and DURHAM, J., concur.
DOLLIVER and ANDERSEN, JJ., concur in the result.

UTTER, J. (dissenting)—The issue in this case concerns the negligence of DSHS in conducting a home study for the foster placement of children previously removed from their natural parents.[5] The majority, by incorrectly focusing on the liability of the caseworkers as individuals rather than DSHS as an agency, needlessly deprives appellants, tragic

---

[5]The agency's potential liability for negligence in removing children from the home is not at issue in this case. As the majority points out, removal of the Babcock children took place in Louisiana. Therefore, it is not necessary here, as the majority states at page 104, for the court to make a distinction between placement and removal. To do so would result in the court deciding issues not presented before it.

victims of preventable sexual abuse, from presenting their case to a jury. The majority rule in this country would allow appellants to do so. *See* Annot., *Governmental Tort Liability for Social Service Agency's Negligence in Placement, or Supervision After Placement, of Children,* 90 A.L.R.3d 1214 (1979). The majority in this case not only incorrectly analyzes the controlling issue but also, in effect, revives sovereign immunity, a doctrine abolished by the Legislature in RCW 4.96.010. Because of this misapplication of immunity and because the petitioners make out a case for negligence against the State, I dissent.

I

The trial court dismissed the appellants' case upon the defendants' motion for summary judgment. A motion for summary judgment cannot be granted against a nonmoving plaintiff if there exists an issue of material fact, either presented in the plaintiff's pleadings or in affidavits produced in opposition to the motion. CR 56. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Hartley v. State,* 103 Wn.2d 768, 774, 698 P.2d 77 (1985). In such a motion, the moving party bears the initial burden of showing the absence of an issue of material fact. *LaPlante v. State,* 85 Wn.2d 154, 158, 531 P.2d 299 (1975). An appellate court reviewing a summary judgment places itself in the position of the trial court and considers the facts in a light most favorable to the nonmoving party. *Del Guzzi Constr. Co. v. Global Northwest Ltd.,* 105 Wn.2d 878, 882, 719 P.2d 120 (1986). The record in this case reveals issues of material fact in support of plaintiffs Erika and Beth Babcock's claim for negligence. The majority circumvents these by framing the legal issues improperly.

In framing the issues as it has, the majority neglects to address the ultimate source of the harm experienced by the Babcock girls. The record contains nothing to suggest that the DSHS caseworkers were not following agency procedures when conducting their background investigation of Mr. Michael. The relevant inquiry, then, concerns not the

acts of the individual caseworkers but the sufficiency of DSHS's home study requirements and the adequacy of its training and supervision of personnel conducting such studies. This negligence occurred before the hearings; the damage resulting from it was discovered only afterward. Therefore, the real issue is not what happened in the hearings, but what procedures took place in the information–gathering process before they began. How did DSHS come to recommend placement in the Michael home in the first place?

On November 14, 1981, one of the DSHS caseworkers visited the Michaels' home and conducted a home study to determine that family's suitability. This was the only home visit and the only occasion in which information for the home study was gathered. The caseworker compiled the information on an "Adoption Application" form, apparently due to the Michaels' expressed interest in adopting the children at some later date. The home study reveals that Lee Michael was unemployed, had a dependence upon alcohol, and was in counseling.

Inexplicably, the caseworker failed to complete one question on the form: "Have you ever been arrested or convicted for a crime?" At the time, it was not standard DSHS policy to investigate as a matter of routine any previous arrests or convictions of prospective foster parents. Thus, DSHS never researched Lee Michael's criminal background. Had it done so, it would have discovered that Michael had a criminal history dating back to 1967 when he pleaded guilty to armed robbery and had been convicted several times in recent years of driving while intoxicated. Michael had also been charged with forcible rape in 1975 and sexual assault and attempted rape in 1979. These events occurred in Benton County. DSHS admits that had it known about this criminal history it would not have recommended that the girls be placed with the Michaels.

The initial placement of the Babcock girls in the Michael home was, in fact, made before the final hearing on the

matter. DSHS initially did this on its own initiative, without juvenile court permission, a few days after returning the girls from Wisconsin. Clerk's Papers, at 3407–08, 3638. The fact that the Babcock girls were already in the Michael home before the disposition hearings took place underscores the fact that the agency's negligence at issue here is separate from anything that may have occurred in the hearings.

Based on this factual situation, I find it inappropriate that the majority extends the individual caseworkers' witness–based immunity to DSHS through an analysis under the law of agency. It is incongruous to protect the negligent acts of the principal with the agent's immunity when the agent's own negligence, if it exists at all, is not an issue. The source of the harm was the agency's negligence, not the acts of the caseworkers following agency procedures. To protect the State this way artfully avoids getting to the bottom of the matter. It effectively creates a sovereign immunity for DSHS in foster placement cases.

Further, to extend the individuals' immunity to DSHS ignores the agency's statutory mandate. Under RCW 13.34-.120, the person or agency filing the dependency petition— here DSHS—must prepare a predisposition study for the court to use in its decision. The study, in this case, included the home study of the Michaels' residence. We cannot minimize the importance of this study. Although the juvenile court considers it along with other evidence produced at the factfinding hearing under RCW 13.34.110, the facts in this case show that the agency's recommendation is given great weight. The juvenile court's ultimate decision not to place the Babcock girls with their natural father illustrates the impact of agency input. The court did this in part because the agencies from the other involved states did not produce enough data to make full recommendations of their own. DSHS was the only agency providing information; the court followed its recommendations.

Because the juvenile court relies on the agency study to such a degree, the accuracy and completeness of this study

*is paramount.* DSHS has a duty to the children involved to provide accurate and complete information. This duty includes proper training of caseworkers, home study design and execution, and follow-up. It is foreseeable that some prospective foster parents may have criminal records, some of these pertaining to sex offenses. To ask the simple question whether or not the foster parent has a criminal record, or to request permission to investigate his or her records, represents a minimal burden. Asking that simple question concerning a foreseeable danger could have avoided placing the Babcock and Long girls with a man repeatedly charged with sex offenses. Failing to do so represents negligence on the part of DSHS.

Courts in other states have addressed the sort of negligence with which DSHS is associated here. These courts have found that the agencies responsible for negligent foster placement are not immune from suit. *See, e.g., National Bank v. Leir,* 325 N.W.2d 845 (S.D. 1982); *Koepf v. County of York,* 198 Neb. 67, 251 N.W.2d 866, 90 A.L.R.3d (1977); *Little v. State Div. of Family Servs.,* 667 P.2d 49 (Utah 1983); *Elton v. County of Orange,* 3 Cal. App. 3d 1053, 84 Cal. Rptr. 27 (1970); *Bartels v. County of Westchester,* 76 A.D.2d 517, 429 N.Y.S.2d 906 (1980). The majority attempts to distinguish these cases, implying that they addressed issues of immunity not presented here, in particular the discretionary/nondiscretionary distinction applicable to public entities. The majority then focuses on the role of the juvenile court in the placement process, with the implication that these proceedings purge all the parties of liability.[6]

---

[6]The majority's claim that these cases are irrelevant, see majority at 104, can only be made in the context of the improperly framed issue upon which the majority bases its opinion. Again, the immunity based on participation in adversarial proceedings is irrelevant because the caseworkers' individual negligence is not the issue here. The majority ignores this distinction and focuses on the individuals. See, *e.g.,* majority at 104 ("applying those cases would require us to distinguish between the *caseworker's* actions in removing the child from the home and *his* actions in placing the child"). (Italics mine.) The negligence at issue is that of DSHS, a broader negligence concerning the manner in which it conducted

Many of the courts cited above faced similar statutory schemes in which a juvenile court reviewed the agency's foster placement recommendation before making the final decision. *See, e.g.,* Neb. Rev. Stat. §§ 43–208, 43–209; New York Soc. Serv. Law §§ 384, 384–b; Cal. Welf. & Inst. Code § 600 (now repealed). Although they did not discuss it, these courts decided their cases on the basis of the discretionary/nondiscretionary analysis apparently because the agencies' function was, as it is here, essentially distinct from what occurs in the dependency hearings. The *Koepf* court in particular reviewed the immunities of each major figure in the juvenile court proceedings—the judge, the county attorney, and the sheriff—before finding that the agency was not immune. 198 Neb. at 70–73. The court did not even entertain the notion that the immunities arising from the judicial proceeding could apply to the agency's prior act of factfinding. The cases above represent the majority rule in this country.

## II

The law of torts serves two basic functions: it seeks to prevent future harm through the deterring effect of potential liability and it provides a remedy for damages suffered. By effectively reviving sovereign immunity, the majority strips tort law of these essential functions as it relates to the actions of the State in foster placement.

The majority implies that the fear of liability will discourage DSHS from gathering accurate placement information. On the contrary, this "fear" can only result in pressure on DSHS to perform its duties properly. Rather than inhibit the flow of placement information from DSHS, exposure to liability will help insure that such information

---

home studies and supervised employees. The employees were only following agency procedures. They may have immunity in the adversary process, but their actions are not the crux of the problem. Therefore, grasping the logic of *Imbler v. Pachtman,* 424 U.S. 409, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976); *Butz v. Economou,* 438 U.S. 478, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978); and *Briscoe v. LaHue,* 460 U.S. 325, 75 L. Ed. 2d 96, 103 S. Ct. 1108 (1983) is not the point. These latter cases are the irrelevant ones.

is complete and accurate. If the agency's foster placement actions are cloaked in immunity, we have no assurance that the type of tragic event at issue here will not happen again.

In addition to failing to prevent similar occurrences in the future, the majority overlooks the second function of the law of torts. When two young girls, placed in a dangerous foster home when knowledge of its danger was readily available, were repeatedly raped and molested due to DSHS's easily avoided negligent omission, this court should not leave them without a remedy.

It is all the more distressing that the denial of recovery is based on an analysis that incorrectly frames the case's issues. The majority spends much of its time discussing the individual immunity of the caseworkers. The individuals are not liable in the first place; they were only following agency procedures. The real question concerns DSHS's actions as an agency: it followed defective home study procedures and did not train and supervise its personnel adequately. The majority does not directly address this and, as a result, decides something that is not an issue in this case.

There is evidence from which it can be argued that DSHS was negligent in the way it handled the Babcock girls' foster placement. Because these actions were not attributable to the individual caseworkers, the immunity accorded the caseworkers through their participation in adversarial proceedings is not applicable to the agency. DSHS is not immune from suit. I therefore dissent.

BRACHTENBACH and PEARSON, JJ., concur with UTTER, J.

Reconsideration granted September 6, 1989.