# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| C.C., an individual,<br><br>       Appellants,<br><br>A.B., an individual; D.E.F., an individual; M.R., an individual; J.L., an individual; B.F., as guardian for K.F., an individual; C.B., an individual; A.M., an individual,<br><br>       Plaintiffs,<br><br>   v.<br><br>KIWANIS INTERNATIONAL, a non-profit entity; KIWANIS PACIFIC NORTHWEST DISTRICT, a non-profit entity; KIWANIS OF TUMWATER, a non-profit corporation; KIWANIS OF CENTRALIA-CHEHALIS, a non-profit entity; KIWANIS OF UNIVERSITY PLACE, a non-profit entity; KIWANIS VOCATIONAL HOME, a nonprofit entity; LEWIS COUNTY YOUTH ENTERPRISES, INC. d/b/a Kiwanis Vocational Homes for Youth, a non-profit corporation; BARBARA THOMPSON as Personal Representative for the ESTATE CHARLES MCCARTHY; EDWARD J. HOPKINS, an individual; UNITED WAY OF PIERCE COUNTY, d/b/a CHILDREN'S INDUSTRIAL HOME and/or COFFEE CREEK CENTER; COFFEE CREEK CENTER, a non-profit entity; CHILDREN'S INDUSTRIAL HOME d/b/a COFFEE CREEK CENTER, non-profit entity; MENTOR HOUSE, d/b/a CHILDREN'S INDUSTRIAL HOME and/or COFFEE CREEK CENTER, a nonprofit entity; STATE OF WASHINGTON; STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, DEPARTMENT CHILDREN, YOUTH AND FAMILY SERVICES, CHILD PROTECTIVE SERVICES, governmental entities,<br><br>       Respondents. | No. 57207-9-II<br><br><br><br><br><br><br>UNPUBLISHED OPINION |

No. 57207-9-II

CHE, J. — CC appeals a summary judgment order in favor of the Kiwanis Defendants. CC, who was subject to abuse at the foster care group home known as Kiwanis Vocational Home for Youth (KVH), alleged that the KVH governing boards were negligent in hiring and supervising KVH employees and negligent in treating and supervising KVH residents. He further claimed that this negligence proximately caused the abuse. CC brought a lawsuit against various Kiwanis entities[1] (Kiwanis Defendants) arguing that they were vicariously liable for the aforementioned negligence. Specifically, CC contended that the Kiwanis Defendants were in an actual or apparent agency relationship with the KVH boards.

The Kiwanis Defendants moved for summary judgment arguing that the corporate dissolution survival statute, RCW 23B.14.340, is a statute of repose, which barred liability against the now dissolved KVH boards, and that bar extended to them. They also argued that there was no actual or apparent agency relationship between the Kiwanis Defendants and the KVH Boards. The trial court granted summary judgment in favor of the Kiwanis Defendants.

CC appeals arguing that summary judgment dismissal of the Kiwanis Defendants was inappropriate because the corporate dissolution survival statute is not a statute of repose and even if it was it does not extend to bar the Kiwanis Defendants from vicarious liability and that genuine issues of material fact exist as to whether an actual or apparent agency relationship existed between the Kiwanis Defendants and the KVH boards. CC also attempts to argue that the Kiwanis Defendants are KVH's alter ego.

_____

[1] The Kiwanis entities named in the complaint are as follows: Kiwanis International, Kiwanis Pacific Northwest District (KPNW), Kiwanis of Tumwater, Kiwanis of Centralia-Chehalis— which was formerly two separate clubs of those respective areas, and Kiwanis of University Place. CP at 660-62.

2

No. 57207-9-II

We hold that (1) RCW 23B.14.340 is a statute of repose but that it provides a personal defense that does not bar vicarious liability claims against the Kiwanis Defendants on procedural grounds, (2) there is a genuine issue of material fact regarding whether an actual agency relationship between KVH and Kiwanis International existed, (3) there is a genuine issue of material fact regarding whether an apparent agency relationship between KVH, Kiwanis International, and the local clubs existed, and (4) CC's alter ego argument is not properly before us. We affirm the grant of summary judgment as to Kiwanis Pacific Northwest District (KPNW). But we reverse the trial court's summary judgment order as to Kiwanis International and the local clubs and remand the matter for the trial court to conduct further proceedings consistent with this opinion.

FACTS

Lewis County Youth Enterprises (LCYE) was a Washington nonprofit corporation, doing business as Kiwanis Vocational Homes for Youth (KVH). Beginning operation in December 1979, KVH "provided residential care for teenage boys in need of supervision and treatment for problems caused by emotional and behavioral difficulties." Clerk's Papers (CP) at 3283. The Kiwanis Defendants—comprised of Kiwanis International, KPNW, and several local Kiwanis clubs—had a long-complicated relationship with LCYE and KVH. LCYE and KVH each had a board of directors, and both boards were involved in the management of the vocational home.

CC, a resident at KVH sometime around 1988-1989, was subject to abuse during his time at KVH. In 2020, CC filed a lawsuit against the Kiwanis Defendants, among others. CC alleged that the Kiwanis Defendants negligently breached special relationship duties they owed to the KVH residents during his time at KVH.

3

CC also contended that KVH and its boards—the LCYE Board and the KVH Board—were negligent in hiring and retaining staff and negligent in the treatment and supervision of KVH residents. CC argued that the Kiwanis Defendants were liable for the aforementioned negligence of the LCYE Board and the KVH Board because each of the Kiwanis Defendants were the actual and apparent principals of the boards. CC also brought claims against Charles McCarthy, the executive director of KVH who was in charge of day-to-day operations, in his individual capacity.

The Kiwanis Defendants moved for summary judgment dismissal of CC's claims against them, arguing that (1) they did not have a special relationship with the children at KVH, (2) they lacked an agency relationship with KVH, its boards, and any other negligent actors, and (3) RCW 23B.14.340 is a statute of repose that bars CC's untimely claims. CC responded, notably including an argument that the Kiwanis Defendants were liable under the alter ego doctrine. The alter ego basis for liability was not in CC's complaint.[2]

At the summary judgment hearing, the trial court specifically determined that the Kiwanis Defendants did not have a special relationship with CC. In all relevant aspects to this appeal, the trial court granted summary judgment for the Kiwanis Defendants.

CC's claims against McCarthy went to a jury trial. CC argued that McCarthy had a duty to protect CC from third party sexual assault because he had a "special relationship" duty with the children at KVH. CP at 5282. CC then argued that McCarthy breached that duty by failing

---

[2] CC's sophisticated counsel did not move to amend the complaint to add the alter ego theory. The Kiwanis Defendants did not address the alter ego in their reply brief. And CC did not raise the alter ego theory referenced in his response brief at the summary judgment hearing.

to provide reasonable protection to CC by (1) failing to employ proper oversight of the hiring and supervision of KVH employees, (2) allowing a person to remove CC from KVH to take CC to a motel without verifying the person's background or establishing safety mechanisms, and (3) taking CC to McCarthy's own home and sexually abusing him.

The jury found McCarthy was grossly negligent and that the negligence proximately caused the abuse that occurred to CC. The jury awarded $375,000 in damages to CC.

CC appeals the summary judgment order dismissing the Kiwanis Defendants.

Below, we summarize the evidence in the record regarding the Kiwanis organizational structure, KVH and its organizational structure, the ability of the Kiwanis Defendants to control KVH, and the State's understanding of the relationship between the Kiwanis Defendants and KVH.

## I. KIWANIS ORGANIZATIONAL STRUCTURE

The Kiwanis Defendants are comprised of different entities with different functions: Kiwanis International, KPNW—a Kiwanis regional district, and local Kiwanis clubs.

A.     *Kiwanis International*

Kiwanis International is a corporation that occasionally selects and supports global civic service projects. Kiwanis International owns the name, logo, and other marks of Kiwanis. Kiwanis International allows local clubs to use the name in connection with their service projects. "Third party entities outside of the Kiwanis family of service clubs may not use the name and logo without Kiwanis International's permission." CP at 1126. "Kiwanis International does not have the authority to determine, dictate, or decide which service projects the local clubs provide to the local community." CP at 1126.

But Kiwanis International retains the exclusive right to create new local clubs, to require local clubs to maintain certain standards and practices via adoption of the model bylaws, and to approve local club bylaws and amendments to those bylaws. And Kiwanis International may revoke a local club's charter for violating the local club's bylaws or Kiwanis International's constitution and bylaws. A 1984 Kiwanis International policies document provided that no local clubs or districts "may sponsor beyond the club level any organization, except Circle K, Key Club or Kiwanianne." CP at 1261.

The 1980, 1985, and 1987 Kiwanis constitutions provided that Kiwanis International had the power "To create, supervise, and control chartered clubs and districts or other groups of chartered clubs and divisions thereof." CP at 1183. The constitutions also provided that "the word Kiwanis, and the name, emblem, and/or insignia of Kiwanis International shall not be used for any purpose other than that authorized by the Board of Trustees." CP at 1193.

The 1985 Kiwanis International bylaws provided that "Kiwanis International has the exclusive right to control . . . usage of the Kiwanis Marks by a chartered club and to control the nature, quality, and uniformity of the services and membership of chartered clubs in connection with which the Kiwanis Marks are used." CP at 2761. The amended 1988 constitution allowed use of the Kiwanis name and marks with "the written consent of Kiwanis International." CP at 1205.

Kiwanis International interacts with local Kiwanis clubs by collecting dues, approving their articles of incorporation and bylaws, offering them support, and requiring them to submit reoccurring reports. The 1980 Kiwanis International bylaws state that Kiwanis International has the responsibility to purchase "comprehensive general liability insurance program for the

6

protection of Kiwanis clubs, their members, and Kiwanis-sponsored organizations and activities." CP at 2682. And Kiwanis International purchased such insurance.

B. *Regional Districts*

Kiwanis International creates and organizes districts, which are corporate entities autonomous from Kiwanis International, and the districts "do not operate or supervise local clubs located in their geographic area." CP at 1124. The Kiwanis districts (1) serve as liaisons between Kiwanis International and local clubs, (2) promote the growth of new and existing local clubs, and (3) act as a mediator for the internal conflict within local clubs or among them. Some Kiwanis districts select civic service projects to encourage clubs within the district to support. The Kiwanis International internal governance director stated that KPNW, a district, never selected KVH as a service project.

Kiwanis districts lack the authority to authorize third parties, which may include service project organizations, to use the name and trademark of Kiwanis International. Kiwanis district bylaws and articles of incorporation—but not their internal procedures—must be approved by Kiwanis International. Kiwanis International retains the power to disband Kiwanis districts and clubs. The members of Kiwanis districts are the local Kiwanis clubs.

C. *Local Clubs*

To form a local club, Kiwanis International or a Kiwanis district will visit an area to find potential members who are interested in forming a local club, or groups may apply to Kiwanis International to form a local Kiwanis club. The newly formed clubs adopt their own bylaws, which are generally based off Kiwanis International's model bylaws. Kiwanis International decides whether to approve the bylaws before deciding to grant a charter to the local club.

Local Kiwanis clubs are members of Kiwanis International—but the members of the local clubs are not members of Kiwanis International. Local clubs are expected to comply with Kiwanis International's constitution and bylaws. If Kiwanis International received credible allegations that a local club violated Kiwanis International's constitution or bylaws, Kiwanis International "may investigate and take corrective steps" and it has the authority to withdraw a local club's charter. CP at 1123.

Local Kiwanis clubs select civic service projects to support based on the needs of their local community. The internal governance director of Kiwanis International believed that local clubs considered KVH to be a service project and stated that KVH "appears to be" a service project. CP at 2592. When asked whether local clubs control their service projects, the internal governance director responded that a club may or may not control a service project as service projects vary widely, including merely fundraising or volunteering with another organization. But the internal governance director also stated that KVH, as a service project, would be bound by the Kiwanis bylaws, constitution, and internal policies and procedures.[3]

## II. KVH AND ITS BOARDS

KVH had two boards: the LCYE Board and the Centralia-Grand Mound-Rochester, Chehalis, Tumwater, Kiwanis Vocational Homes for Youth Board (KVH Board). The bylaws of the KVH Board and LCYE Board mandated that the respective boards were to be comprised of Kiwanis club members.

---

[3] An overview committee dealt with public relations relating to KVH. The committee's monthly meeting minutes from November 1988 stated KVH is "a project for Kiwanis International." CP at 3045. But the significance of this statement is not clear, and more generally, it is unclear who authored this document.

A.     *The LCYE Board*

In June 1977, LCYE was incorporated. LCYE was doing business as KVH.[4] In 1978, McCarthy was hired as the executive director of KVH. According to McCarthy's job description, he "ha[d] the responsibility of personnel management including hiring, termination, training of all employees and volunteers of the [KVH] and being accountable for their actions." CP at 1817. That same document also provided, "[t]he director must be accountable to his Board of Directors," among others. CP at 1817. A volunteer psychologist at KVH, in 1990, opined that McCarthy essentially had complete control over the business and management of KVH. McCarthy believed only the LCYE Board could fire him.

The LCYE bylaws provided, "the purpose and mission of this corporation shall continue to be the operation of group homes for youth in Washington State doing business as Kiwanis Vocational Homes for Youth." CP at 1295. The bylaws also provided that all corporate power, including "direction and management of all affairs of the corporation" of KVH was vested in the LCYE Board. CP at 2627.

However, the LCYE bylaws also provided, "The role of the Board shall be to set general policy and guidelines for the operation of individual group homes, not to become involved in the direct management and operation of the homes." CP at 1299. But in September 1989, LCYE elected a board member to represent the LCYE Board regarding personnel issues at KVH; the board member would arbitrate grievances not satisfied through the normal chain of command at KVH.

---

[4] LCYE is a holding corporation for KVH. It owns "all the lands, buildings, building contents, and vehicles at K.V.H." CP at 1276.

9

In 1990, the LCYE Board was comprised of all Kiwanis club members, including Sam Morehead. In an April 2018 deposition, Morehead—a former member of the KVH Board and LCYE Board—stated that local Grand Mound Rochester Kiwanis club placed members on either the LCYE Board or KVH Board with the intent to control the "day-by-day operations" of KVH.[5] CP at 2657.

In November 1990, the State Office of Special Investigation (OSI) found that rampant illegal misconduct occurred at KVH. For example, OSI found that McCarthy hit a student, McCarthy misappropriated state funds, staff assaulted students, the child care and social service staff did not meet the minimum education and experience requirements, and McCarthy failed to report crimes occurring, among many other problems.

McCarthy remained the director of KVH until December 1990. Under a management agreement between Children's Industrial Home and KVH, Claude Carlson of Children's Industrial Home became the new executive director of KVH. In September 1993, KVH changed its name to Coffee Creek Center. Children continued to be placed at Coffee Creek Center. In June 2010, LCYE was administratively dissolved.

B.  *KVH Board*

In February 1986, the KVH Board was incorporated. The KVH Board was formed to help raise start-up money for KVH. The KVH Board supported KVH by soliciting goods for the operation of KVH.

---

[5] The Kiwanis Defendants cite to a transcript not in our record for the proposition that Morehead later recanted his statement in a January 2021 deposition, stating "the board was not for the day-to-day operations of the home." Br. of Resp't at 17. In any event, the local Grand Mound/Rochester Kiwanis club is not a party to this litigation.

The KVH Board was made up of Kiwanis members. According to the bylaws, the KVH Board had the right to direct "the business and affairs" of the corporation and was also vested with "[a]ll corporate power and authority of the corporation." CP at 2602-03. But some individuals referred to this board as the KVH Advisory Board. Board members were somewhat unsure about their duties. There was an internal dispute about whether the KVH Board was in fact advisory.

One board member, Henry Meister, believed the KVH Board had management powers and stated that the board was negligent in not exercising those powers. In June 1989, the KVH Board determined that it was in fact advisory. In May 1991, the KVH Board was administratively dissolved. In a January 2017 deposition, Cornwell, a onetime KVH director, stated that the KVH Board was essentially not involved in KVH.

### III. THE KIWANIS DEFENDANTS' RIGHTS TO CONTROL KVH

Next, we examine the facts regarding the level of control the Kiwanis Defendants had over KVH and its boards—organized by: the contract between Kiwanis International and KVH, the support for the formation and ongoing operations of KVH, the use of Kiwanis name, and the Kiwanis investigation of KVH.

A.    *Kiwanis International's Contract with KVH*

In May 1988, Kiwanis International agreed to KVH's continued use of the Kiwanis name and logo. The parties entered into a contract to this end. In essence, in exchange for the continued use of the Kiwanis name, KVH agreed to a set of conditions, including (1) KVH and "its members will at all times recognize, abide by, and observe as effectively binding upon itself and its members the Constitution, Bylaws and Policies of Kiwanis International", (2) KVH "will

11

from time to time upon the request of [Kiwanis International] . . . amend its bylaws to eliminate therefrom any conflict with Constitution and Bylaws of Kiwanis International", (3) Kiwanis International could require KVH to dissolve or change its corporate form at any time, (4) and KVH could not amend its articles of incorporation without Kiwanis International's written consent. CP at 3033.

The governance specialist for Kiwanis International stated, "Nowhere in this contract does KVH agree to submit to the control or supervision of Kiwanis International, nor did Kiwanis International have any mechanism to control or supervise KVH under this contract." CP at 1127. It is unclear what mechanisms existed to ensure KVH's compliance with Kiwanis International's agreement.

B.      *Support for Formation and Ongoing Operations*

Many of the local Kiwanis clubs helped support the formation of KVH and its ongoing operation.[6] Generally, the local Kiwanis clubs provided various kinds of support for KVH, like providing building materials, clothes, medical services, counseling services, food, some financial contributions, and other personal effects. The State provided the primary monetary support for KVH. In an August 1987 letter to KPNW, the KVH attorney, George Darkenwald, wrote that there was a consensus among the founders of KVH that the objectives of KVH were those of the Kiwanis.

---

[6] A KVH pamphlet opined that the founding of KVH was born of the interest of the local Kiwanis clubs.

C.      *Use of the Kiwanis Name*

In 1979, the KPNW Board minutes evidence that the KPNW Board believed that for KVH to use the Kiwanis name and marks, particularly in the context of fundraising for LCYE, KVH had to be "strictly and entirely a Kiwanis project." CP at 2538. But that statement did not express that KVH was, in fact, "strictly and entirely a Kiwanis project." CP at 2538. Nonetheless, KVH appeared to use the Kiwanis name without Kiwanis International's permission until 1988. But generally, local Kiwanis clubs could have used the Kiwanis name with service projects, and the local clubs believed KVH was a service project.

In January and February 1987, KPNW sent letters expressing concerns about ensuring that Kiwanis International, KPNW, and the local clubs did not incur liability for the acts of KVH. The letters specifically concerned themselves with KVH's use of the Kiwanis name. In August 1987, KVH reached out to KPNW for aid in acquiring formal permission for the continued use of the Kiwanis name. In this communication, the KVH attorney stated, "when people in the community and in local and state government hear the name Kiwanis Vocational Home they think of the high ideals and principles of Kiwanis, and of the dedication and skill Kiwanians devote to the goals of Kiwanis." CP at 2525.

Sometime thereafter, KVH requested formal permission from Kiwanis International for use of the Kiwanis name. In the letter requesting permission, McCarthy stated, that KVH cherished the Kiwanis name and the name was "most vital in continuance of our endeavors." CP at 2544-45. To that end, McCarthy opined that changing the name of KVH would cause a six-month delay of state funding. As previously mentioned, Kiwanis International entered into a contract with KVH allowing KVH's continued use of the Kiwanis name. McCarthy retired

13

shortly thereafter. A 1990 internal memo from the OSI investigation evidenced that Kiwanis International would have revoked KVH's right to continue using the Kiwanis name if KVH did not terminate McCarthy.

D.      *Kiwanis Investigations*

In September 1984, the Department of Social and Health Services (DSHS) published a performance audit of KVH, finding that KVH did not comply with several material contract requirements. In July 1985, the local Kiwanis club in Centralia became concerned about KVH's use of the Kiwanis name and requested insurance policies relating to KVH, correspondence about the use of the Kiwanis name, information about KVH's accounts payable, and a copy of KVH's articles of incorporation and bylaws. That month, McCarthy responded essentially asserting that he was responsible only to the LCYE Board. He declined to send the local Centralia club the requested information, and he informed the club that KVH would nevertheless continue using the Kiwanis name.

After two local Kiwanis clubs withdrew their support from KVH, KPNW formed an investigative committee to investigate allegations about sexual abuse of residents, improper manipulations of business records, and other administrative malfeasance. The committee's mission was to save KVH "'and protect the Kiwanis name.'" CP at 3079. In July 1990, the committee issued its report, finding that no evidence showed that sexual abuse occurred at KVH. The committee issued a series of recommendations for KVH. Nothing in the record suggests that KVH viewed these recommendations as binding requirements.

IV. THE STATE'S UNDERSTANDING OF THE RELATIONSHIP BETWEEN KVH AND KIWANIS

Mark Redal, the regional administrator for the Division of Children and Family Services (DCFS) within DSHS from 1984-94, submitted a declaration attesting to the following facts.

Redal received letters from McCarthy in which McCarthy used the Kiwanis logo, marks, and name. Redal recalled that Kiwanis International and local Kiwanis clubs "met with DSHS personnel at various points to ensure that [KVH] was a safe and reliable placement facility for wards of the State." This left Redal with the impression that Kiwanis International and the local clubs "definitely had more than a name-only interest." He explained, "Their additional eyes and ears on the facility gave me the impression that they also shared our concerns that policies were being adhered to and that issues were brought forward for resolution when problems arose." CP at 3433.

DCFS staff wrote a letter endorsing KVH to KPNW. In his declaration, Redal surmised that when DCFS decides which group homes to develop and support, "Proposals with the backing of entities like Kiwanis probably had more potential to be developed as resources." CP at 3434. But in a February 2020 deposition, Redal stated that licensing decisions were about meeting certain health and safety requirements, and he did not think "the name of a Kiwanis would have a bearing on that." CP at 1569.

In his declaration, Redal further opined, "The KVH connection to Kiwanis lent credibility to the group home, and a certain amount of assurance that additional support, oversight and even funding would be available to KVH. The fact that it was a Kiwanis-sponsored project, gave me the impression of stability and reliability." CP at 3434. Redal further opined, "In light of the investigation done by Kiwanis International in response to the concerns about KVH expressed by

Kiwanis members, I had the impression that the Kiwanis backing meant the KVH group home administration was accountable to entities other than just Region 6 administration." CP at 3434. But Redal did concede, "I do not believe our region would have kept the facility open just because of the Kiwanis backing." CP at 1822.

In the February 2020 deposition, Redal stated that he thought Kiwanis, as an organization, was involved in the operation of KVH, but was not sure exactly how. Redal formed this belief based on KVH's use of the Kiwanis name and logo and also the amount of support and involvement the local Kiwanis clubs provided to KVH. Redal also stated that DCFS standards were not relaxed because of KVH's affiliation with Kiwanis. Finally, Redal stated if the State wanted to discuss something with KVH, they would call McCarthy as the director.

ANALYSIS

CC claims that the Kiwanis Defendants' liability, as principals, flows from their alleged actual and apparent agency relationship with KVH and its boards. Specifically, CC contends that the KVH boards—the LCYE Board and the KVH Board—were negligent in hiring and retaining certain employees and negligent in their oversight of the treatment and supervision of KVH residents. CC also claims that each of the Kiwanis Defendants are liable for said negligence under the actual and apparent agency theories.

On appeal, CC argues that the trial court erred by granting summary judgment dismissal of the Kiwanis Defendants because the corporate dissolution survival statute is not a statute of repose and even if it was it does not extend to bar the Kiwanis Defendants from vicarious liability and that genuine issues of material fact exist as to whether an actual or apparent agency

16

relationship existed between the Kiwanis Defendants and the KVH boards. CC also attempts to argue that the Kiwanis Defendants are KVH's alter ego.

The Kiwanis Defendants respond that they are immune from such liability because (1) the KVH boards—the alleged agents—are immune from liability as a matter of law under RCW 23B.14.340, a corporate dissolution statute, and that immunity extends to the Kiwanis Defendants, and (2) the Kiwanis Defendants did not have an actual nor an apparent agency relationship with the KVH boards.

## I. Legal Principles

We review summary judgment orders de novo. *Mohr v. Grantham*, 172 Wn.2d 844, 859, 262 P.3d 490 (2011). CR 56(c) provides that summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When determining whether summary judgment was appropriate, we view the evidence in the light most favorable to the nonmoving party. *Mohr*, 172 Wn.2d at 859.

## II. The Corporate Dissolution Survival Statute Does Not Bar CC's Vicarious Liability Claims Against the Kiwanis Defendants

RCW 23B.14.340, known as the corporate dissolution survival statute, provides,

> The dissolution of a corporation . . . shall not take away or impair any remedy available against such corporation, its directors, officers, or shareholders, for any right or claim existing, or any liability incurred, prior to such dissolution or arising thereafter, *unless action or other proceeding thereon is not commenced within two years after the effective date of any dissolution that was effective prior to June 7, 2006, or within three years after the effective date of any dissolution that is effective on or after June 7, 2006.*

(Emphasis added.)  The LCYE Board was dissolved in June 2010, and the KVH Board was dissolved in May 1991; both long before CC filed his lawsuit in 2020.  The trial court ruled that RCW 23B.14.340, which barred claims against KVH, also barred claims against its alleged principals, the Kiwanis Defendants.

CC argues that the trial court erred because RCW 23B.14.340 is not a statute of repose, and even if RCW 23B.14.340 is a statute of repose, it does not bar CC's vicarious liability claims because statutes of repose are personal defenses that cannot be raised by the Kiwanis Defendants as principals.  CC emphasizes that RCW 23B.14.340 includes a list of enumerated individuals subject to the liability limitation, but it does not include the term principals.  We hold that RCW 23B.14.340 is a statute of repose, but it does not bar CC's vicarious liability claims against the Kiwanis Defendants because the statute of repose is a personal defense.

A.      *RCW 23B.14.340 is a Statute of Repose*

Whether RCW 23B.14.340 is a statute of repose is a legal question, which we review de novo.  *See Matter of Dependency of A.M.F.*, 1 Wn.3d 407, 411, 526 P.3d 32 (2023).  It is one which we have already answered in the affirmative in *R.N. v. Kiwanis Int'l*, 19 Wn. App. 2d 389, 404, 496 P.3d 748 (2021), *cert denied* 199 Wn.2d 1002 (2022).

Unlike statutes of limitation, statutes of repose "provide[] a time period in which the cause of action must accrue—not a time period from accrual to commencement of the action." *Donovan v. Pruitt*, 36 Wn. App. 324, 327, 674 P.2d 204 (1983).  "A claim generally accrues when a party has the right to seek relief in court."  *Wash. State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Const. Co.*, 176 Wn.2d 502, 511, 296 P.3d 821 (2013).

We have determined that RCW 23B.14.340 is a statute of repose. *R.N.,* 19 Wn. App. 2d at 404. "At common law, when a corporation dissolved, it ceased to exist for all purposes and therefore could not be sued." *Id.* at 400-01. "That common law rule has been modified in most states by statutes generally known as survival statutes, which permit lawsuits to be filed against dissolved corporations for a limited period." *Id.* at 401. In *R.N.*, we explained that RCW 23B.14.340 was a corporate survival statute, and corporate survival statutes act as statutes of repose extinguishing liability against dissolved corporations—distinct from statutes of limitations. *Id.* at 402.

RCW 23B.14.340 does not provide a time period for accrual to commencement of the action. Rather, the plain language of RCW 23B.14.340 provides that, regardless of when accrual occurs, all claims are terminated against dissolved corporations if not filed within the listed time limitations. RCW 23B.14.340 terminates a right of action after a specified time, even prior to the claim's accrual, unlike a statute of limitation. Thus, RCW 23B.14.340 is a statute of repose.

B.      *Dismissal of the Boards Under RCW 23B.14.340 Does Not Extend to Bar Liability for the Kiwanis Defendants*

Having established that RCW 23B.14.340 is a statute of repose, we must next determine whether its application to the Boards extends to the Kiwanis Defendants to bar their vicarious liability as alleged principals.

"'An agent's immunity from civil liability generally does not establish a defense for the principal.'" *Savage v. State*, 127 Wn.2d 434, 439, 899 P.2d 1270 (1995) (quoting *Babcock v. State*, 116 Wn.2d 596, 620, 809 P.2d 143 (1991) (plurality)). However, our Supreme Court has held that "a principal cannot be held derivatively responsible when the agent has been discharged

. . . only insofar as the judgment for the agent is 'on the merits and not based on a personal defense.'" *Vern J. Oja & Assocs. v. Wash. Park Towers, Inc.*, 89 Wn.2d 72, 77, 569 P.2d 1141 (1977) (quoting RESTATEMENT (FIRST) OF JUDGMENTS § 99 (1942) (holding that the statute of limitations defense was personal and it did not result in a dismissal on the merits)). Thus, a critical question for this court to answer is whether dismissal under RCW 23B.14.340 is a judgment on the merits or a personal defense.

We determine that RCW 23B.14.340 is a personal defense. The ordinary meaning of judgment on the merits is a judgment based on the evidence, not a procedural bar. BLACK'S LAW DICTIONARY 1007 (12th ed. 2024). Because RCW 23B.14.340 does not establish a defense based on the evidence, but based on a procedural hurdle, judgments based on RCW 23B.14.340 are not judgments on the merits. Thus, an agent's defense under RCW 23B.14.340 does not sever liability as to the principal.

The Kiwanis Defendants argue that our Supreme Court has recognized "that statutes of repose are to be treated not as statutes of limitation, but as part of the body of a state's substantive law *in making choice-of-law determinations*." *Rice*, 124 Wn.2d at 212 (emphasis added). The Kiwanis Defendants also emphasize that equitable theories, like the discovery rule, do not toll statutes of repose—unlike statutes of limitation.

The Kiwanis Defendants liken the "absolute bar" presented by a statute of repose to immunity, which the Supreme Court has considered a substantive defense in certain circumstances. Br. of Resp't at 56; *Babcock v. State,* 112 Wn.2d 83, 105, 768 P.2d 481 (1989) (plurality) (*Babcock* I), *vacated on recons.*, 116 Wn.2d at 596.

In *Babcock* I, our Supreme Court held "The fact that the [DSHS] caseworkers acted as participants in an adversary hearing renders their actions immune under the common law doctrine of absolute immunity for participants in judicial proceedings." 112 Wn.2d at 97. Then, the court held, "The State is immune to the same extent as its agents because the caseworkers' defense of immunity is not a personal one, but rather relates directly to their role as agents of the State." *Babcock* I, 112 Wn.2d at 105.

However, two years later, on a motion for reconsideration, in *Babcock* II, the Supreme Court reversed its decision in *Babcock I*, holding that the caseworkers were not entitled to common law absolute immunity based on Washington precedent and legislative policy, but the caseworkers were entitled to a judicially created qualified immunity under certain circumstances. *Babcock* II, 116 Wn.2d at 608.

The court further held that the qualified immunity "is a personal immunity designed to limit an individual caseworker's liability for damages." *Babcock* II, 116 Wn.2d at 619. Thus, the State was not entitled to the defense of qualified immunity for the individual caseworkers. *Babcock* II, 116 Wn.2d at 619. The court emphasized that in the legislature's grant of qualified immunity under RCW 26.44.060(3), the legislature specifically chose not to abrogate its waiver of sovereign immunity. *Babcock* II, 116 Wn.2d at 619. And so, the court concluded that it could not extend the common law qualified immunity to the State "in the face of a statutory provision admonishing us not to construe an emergency immunity to abrogate sovereign immunity." *Babcock* II, 116 Wn.2d at 620.

But these holdings in *Rice* and the *Babcock* cases do not change our conclusion. The fact that our Supreme Court has determined that statutes of repose are substantive law *in making*

21

*choice-of-law determinations* is not determinative as it involves a different legal context. *Rice*, 124 Wn.2d at 212. Even if we determined that a statute of repose is like immunity thus triggering the applicability of *Babcock*, it would not compel a different result.

In *Babcock* I, a plurality, rather than a majority, reached the conclusion that the agent's immunity was a substantive defense that applied to the State. 112 Wn.2d at 105 (two of the five justices in the majority concurred in result only). In *Babcock* II, the court reversed *Babcock* I and concluded qualified immunity was a personal defense to the agent that did not extend to the State, the principal. Additionally, in *Babcock* II, the court's reversal of *Babcock* I was not based on the fact that an immunity-like defense could never be a substantive defense. Rather, the court emphasized that the immunity should not extend to the State due to legislative intent to the contrary. *Babcock* II, 116 Wn.2d at 620. Nevertheless, *Babcock* II reiterated the general proposition that "An agent's immunity from civil liability generally does not establish a defense for the principal." 116 Wn.2d at 620.

Of note, *Babcock* II cited to *Creelman* and *Guffey* as examples of an agent's immunity extending to the principal. *Babcock* II, 116 Wn.2d at 621. In *Creelman*, prosecutorial immunity was extended to the state and the county based on public policy considerations. *Creelman v. Svenning*, 67 Wn.2d 882, 885, 410 P.2d 606 (1966). In *Guffey v. State*, the Supreme Court held that "State and Washington State Patrol cannot be held liable when the trooper is immune."[7]

---

[7] The Kiwanis Defendants argue that we should apply RCW 23B.14.340 to principals because this case is like *Creelman*. But the Kiwanis Defendants do not explain how the corporate dissolution protection in RCW 23B.14.340 is anything like the prosecutorial immunity discussed in *Creelman*. Instead, the Kiwanis Defendants maintain that this case is just like *Creelman* because the only remaining theory of liability is vicarious. Such an argument is conclusory as it fails to address any of the prosecutorial immunity specific public policy reasoning in *Creelman*. 67 Wn.2d at 885.

*Babcock* II, 116 Wn.2d at 621 (citing *Guffey v. State*, 103 Wn.2d 144, 153, 690 P.2d 1163 (1984)).  But *Guffey* was effectively overruled in *Savage*, 127 Wn.2d at 442.

While the aforementioned cases do not preclude the possibility that an immunity-like defense for an agent may be substantive, cutting off liability for a principal, they solidify the general proposition that an agent's immunity—which we are assuming but have not decided is similar to a statute of repose—does not establish a defense for the principal.

Whether an agent's immunity applies to the principal in the government context involves a detailed policy oriented factual inquiry.  *Savage*, 127 Wn.2d at 446.  In *Savage*, our Supreme Court held that the qualified immunity of a parole officer did not extend to the State.  *Savage*, 127 Wn.2d at 446.  The court reasoned that "the different functions personal and governmental immunity are designed to serve support maintaining state liability in this context, even where the agent enjoys qualified personal immunity."  *Savage*, 127 Wn.2d at 445.

The court then elaborated that the officer's immunity existed "'to encourage unrestrained execution of responsibility, while for the sovereign it is to prevent judicial scrutiny of basic policies formulated by coordinate branches of government.  To insulate the Government from liability for the inevitable mishaps which will occur when its employees perform their functions without fear of liability not only is unjust, but also serves no purpose for which sovereign immunity need exist.'"  *Savage*, 127 Wn.2d at 445 (quoting *Downs v. United States*, 382 F. Supp. 713, 750 (M.D. Tenn. 1974), *rev'd*, 522 F.2d 990 (6th Cir. 1975)).

But the reasoning in *Savage* was highly policy oriented and specifically used to determine whether the immunity of an individual actor should extend to the State.  Nothing

suggests that the *Savage* reasoning applies beyond the specific context of a principal that is a government agency.

The Kiwanis Defendants also argue that we should apply RCW 23B.14.340 to principals because such a holding is consistent with considerations of practicality, like creating expectations for the closing of a business, including creating a fixed date to extinguish liability stemming from known and unknown claims. The Kiwanis Defendants also assert that we should apply RCW 23B.14.340 to principals because after dissolution, the principal cannot cross-claim against the at-fault agent, creating an injustice.

While we recognize it places on a hardship on principals to not be able to cross-claim against at-fault agents, the argument that principals should have an expectation that liability would be terminated based on the timeline in RCW 23B.14.340 fails because RCW 23B.14.340 does not even mention principals. Given that an agent's defense does not ordinarily apply to principals and given that RCW 23B.14.340 does not mention principals, we decline to apply RCW 23B.14.340 to principals.

Finally, we reiterate that RCW 23B.14.340 results in a judgment based on technical or procedural grounds, not based on the evidence. Thus, RCW 23B.14.340 is a personal defense and not a substantive defense on the merits. Therefore, the immunity of the alleged agents under RCW 23B.14.340 does not immunize the Kiwanis Defendants from liability.

III. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER THE KIWANIS DEFENDANTS HAD AN AGENCY RELATIONSHIP WITH KVH.

CC argues that the KVH boards—the LCYE Board and the KVH Board—were negligent in hiring and retaining certain employees and negligent in treating and supervising KVH

residents. CC contends that each of the Kiwanis Defendants are liable for that negligence under actual and apparent agency theories. We analyze these theories as applied to each individual defendant.

"A principal is vicariously liable for the conduct of an agent acting within the scope of the agency relationship." 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASH. PRAC.: TORT LAW AND PRACTICE § 4:10 (5th ed. 2023). The principal's vicarious liability is predicated upon an agent committing some act of negligence. *Estep v. Hamilton*, 148 Wn. App. 246, 258, 201 P.3d 331 (2008). An agency relationship may be broad or just for a limited purpose. *CKP, Inc. v. GRS Const. Co.*, 63 Wn. App. 601, 608, 821 P.2d 63 (1991). "The relationship may be express or arise by inference from the relation of the parties. Whether one is the agent of another for a specific purpose depends in part upon whether that person has power to act with reference to that purpose." *Id*. at 608.

The party asserting the existence of an agency relationship bears the burden of establishing the same. *Id*. Importantly, the determination of whether an actual agency or apparent relationship exists is usually inappropriate for summary judgment. *ITT Rayonier, Inc. v. Puget Sound Freight Lines*, 44 Wn. App. 368, 377, 722 P.2d 1310 (1986); *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 175 Wn. App. 840, 882, 309 P.3d 555 (2013), *aff'd*, 180 Wn.2d 954 (2014), and *aff'd*, 190 Wn.2d 281 (2018).

The question before us is whether there is a genuine issue of material fact, viewing all the evidence in the light most favorable to CC, as to whether the Kiwanis Defendants had an actual or apparent agency relationship with KVH.

A.    *Actual Agency*

CC argues that summary judgment was improper because, viewing the evidence in the light most favorable to CC, genuine issues of material fact exist as to whether the Kiwanis Defendants had an actual agency relationship with KVH.  We agree with respect to Kiwanis International, but not KPNW or the local clubs.

"Actual authority derives from the principal's objective manifestations of authority to the agent."  *Absher Const. Co. v. Kent Sch. Dist. No. 415*, 77 Wn. App. 137, 143, 890 P.2d 1071 (1995).  Actual authority may be express or implied, and implied actual authority arises from circumstantial evidence showing the principal intended the agent to possess actual authority. *King v. Riveland*, 125 Wn.2d 500, 507, 886 P.2d 160 (1994).  A parent company may be the principal as to an underlying company.  *See FutureSelect*, 175 Wn. App. at 879.

A principal communicating to the agent, whether expressly or impliedly, that the agent may bind the principal is one way to establish agency.  *Chicago Title Ins. Co. v. Off. of Ins. Comm'r*, 178 Wn.2d 120, 143, 309 P.3d 372 (2013).  Agency may also be established where the principal has the right to control the details of the agent's work.  *Id*.  The right-to-control test is particularly applicable where liability stems from the agent's alleged negligence.  *Id.*

> The extent of control exercised by the principal over an agent is essential in determining liability: "When we distill the principles evident in our case law, the proper inquiry becomes whether there is a retention of the right to direct the manner in which the work is performed, not simply whether there is an actual exercise of control over the manner in which the work is performed."

*FutureSelect*, 175 Wn. App. at 878-79 (quoting *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 121, 52 P.3d 472 (2002)).  "The right to control is determined by factors such as the conduct of

the parties, the contract between them, and the right of the principal to interfere in the [alleged agent's] work." *FutureSelect*, 175 Wn. App. at 879.

"[T]he plaintiff need not show that the principal controlled or had the right to control every aspect of the agent's operation in order to incur vicarious liability. Rather, '[i]t should be sufficient that plaintiff present substantial evidence of . . . control or right of control over those activities from whence the actionable negligence flowed.'" *Massey v. Tube Art Display, Inc.*, 15 Wn. App. 782, 787, 551 P.2d 1387 (1976) (quoting *Jackson v. Standard Oil Co.*, 8 Wn. App. 83, 91, 505 P.2d 139 (1972)). "The question of control or right of control is also one of fact for the jury." *O'Brien v. Hafer*, 122 Wn. App. 279, 284, 93 P.3d 930 (2004).

Applying the right-to-control to analyze whether the Kiwanis Defendants were in an actual agency relationship with the KVH boards, our inquiry is focused on whether the Kiwanis Defendants had the right to control the following through the boards: (1) the hiring and supervision of KVH employees and (2) the treatment and supervision of KVH residents. In making these determinations, we view the facts and reasonable inferences in the light most favorable to the non-moving party, CC.

### 1. *Kiwanis International*

Viewing the facts in the light most favorable to CC, as the nonmoving party, we conclude that there are genuine issues of material fact and, therefore, summary judgment was improper as to Kiwanis International.

KVH and Kiwanis International entered into their 1988 agreement around the time when CC was at KVH. While we agree with the Kiwanis Defendants that the 1988 agreement did not provide that KVH may act on all of the Kiwanis Defendants' behalf, it established that Kiwanis

International retained a significant amount of ability to control day-to-day operations and management decisions at KVH.

Under that agreement, Kiwanis International agreed to grant KVH the right to use the Kiwanis name and logo provided that: (1) KVH and "its members will at all times recognize, abide by, and observe as effectively binding upon itself and its members the Constitution, Bylaws and Policies of Kiwanis International", (2) KVH "will from time to time upon the request of [Kiwanis International] . . . amend its bylaws to eliminate therefrom any conflict with Constitution and Bylaws of Kiwanis International", (3) Kiwanis International could require KVH to dissolve or change its corporate form at any time, and (4) KVH could not amend its articles of incorporation without Kiwanis International's written consent. CP at 3033.

At oral argument, the Kiwanis Defendants argued that this contract pertained only to the use of the logo. Wash. Court of Appeals, *A.B. v. Kiwanis Int'l*, No. 57207-9-II, oral argument (April 30, 2024), at 24 min., 14 sec., *audio recording by* TVW, Wash. State's Public Affair Network.[8] It is true that KVH's interest in the agreement was to obtain the right to use the name of Kiwanis. But, as is apparent from the plain language, Kiwanis International's rights under that contract are not limited solely to controlling the use of the logo by KVH. Rather, in exchange for granting KVH use of the logo, Kiwanis International retained broad control over KVH's bylaws and corporate form; control that extended up to and including dissolution of KVH. CP Kiwanis International's right to control KVH operations under the agreement is further evidenced by McCarthy's sudden retirement when Kiwanis International threatened to revoke KVH's right to continue using the Kiwanis name if KVH did not terminate McCarthy.

---

[8] Available at https://tvw.org/video/division-2-court-of-appeals-2024041090/?eventID=2024041090.

When viewed in the light most favorable to CC, the control provided by the contract and Kiwanis International's force-out of McCarthy show that Kiwanis International had the right to control certain aspects of KVH operations, including employment matters. The question is then whether Kiwanis International's right to control KVH operations extended to the negligence that proximately harmed CC—the alleged negligent hiring and firing of KVH staff and the alleged negligent supervision and treatment of KVH residents. In other words, the question is whether the underlying negligence by KVH is within the scope of the agency relationship with Kiwanis International.

The name revocation threat and McCarthy's resignation shortly thereafter provides a reasonable inference that Kiwanis International had the right to take actions that would result in the termination of the executive director. And the 1988 contract gives Kiwanis International the right to control KVH's corporate form, up to dissolution. While there was nothing in the Kiwanis International constitution, bylaws, or policies that provided mechanisms to control the employment decisions at KVH nor the manner of supervision and treatment of KVH residents, the 1988 contract subjected KVH to Kiwanis International's constitution, policies, and bylaws.

Viewing all of the aforementioned evidence in the light most favorable to CC, there is a genuine issue of material fact regarding whether Kiwanis International had the right control the manner in which KVH made employment decisions and the manner in which the boards implemented rules regarding the treatment and supervision of residents.

Next, the Kiwanis Defendants argue that even if an agency relationship existed between Kiwanis International and the KVH boards, those boards did not have control or involvement in the hiring and supervision of KVH employees. The Kiwanis Defendants emphasize that

29

McCarthy had unilateral control over the hiring, firing, and supervision of KVH employees. We disagree.

The LCYE bylaws provided that the purpose of its Board was to continue the operation of KVH. While the bylaws stated, "the role of the Board shall be to set general policy and guidelines for the operation of individual group homes, not to become involved in the direct management and operation of the homes," the bylaws also explicitly provide, "all corporate power and authority of the corporation shall be vested in the Board of Directors." CP at 1296, 1299. The KVH Board's bylaws provided that it had the right to direct "the business and affairs of the corporation." CP at 2602.

Viewing the facts in the light most favorable to CC, there is a genuine issue of material fact whether the LCYE and KVH boards held the power to control the hiring, firing, and supervision of KVH employees as they explicitly held all corporate power under their own bylaws. And as addressed above, there is a genuine issue of material fact whether Kiwanis International held the power to ultimately influence or control the hiring and firing of the executive director or other staff through the KVH boards.

Finally, the Kiwanis Defendants argue that even if Kiwanis International has a principal-agency relationship with the KVH boards, the underlying negligence is outside the scope of the agency relationship because entities cannot be vicariously liable for the sexual crimes of another. It is true that vicarious liability does not extend to an employee's act that is "directed toward personal sexual gratification[]" because such conduct is outside the scope of their employment. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 54, 59 P.3d 611, (2002). But, here, the claim is not that Kiwanis International is vicariously liable for any individual's sexual crimes against CC. Rather,

the claim, as outlined in the complaint, is that Kiwanis International has vicarious liability for the negligent conduct of the KVH boards, which proximately caused sexual misconduct to occur to CC.

Relatedly, the Kiwanis Defendants argue that a principal cannot be vicariously liable for a board condoning sexual misconduct as such conduct does not further any Kiwanis interest. Wash. App. Ct. oral argument, supra. But again, CC's theory is that Kiwanis International is liable for the KVH boards' negligence—not for intentionally condoning sexual misconduct occurring at KVH.

We reverse the summary judgment order as to Kiwanis International.

2. *KPNW*

Even viewing the facts in the light most favorable to CC, we hold that there are no genuine issues of material fact and KPNW was entitled to judgment as a matter of law, therefore, summary judgment was proper as to KPNW on the issue of actual agency.

CC contends that the KPNW manifested actual control over the KVH boards through the following: (1) KPNW agreed to sponsor KVH if it was "'strictly and entirely a Kiwanis Project,'" (2) KPNW had an interest in preserving usage of the Kiwanis name for KVH, and (3) KPNW intervened to save KVH and protect the Kiwanis name. Br. of Appellant at 45-48.

First, the 1979 KPNW Board minutes show that the KPNW Board believed that for KVH to use the Kiwanis name and marks, particularly in the context of fundraising for LCYE, KVH had to be "strictly and entirely a Kiwanis project." CP at 2538. But that prior statement does not express that KVH was, in fact, "strictly and entirely a Kiwanis project." CP at 2538. This evidence does not suggest that KPNW could control KVH. Second, McCarthy did convey to the

Centralia Kiwanis Club that KPNW had an interest in preserving the Kiwanis name for KVH. But again, that evidence does not show that KPNW could exercise control over KVH.

Third, after two local Kiwanis clubs withdrew their support from KVH, KPNW formed an investigative committee to investigate allegations about sexual abuse of residents, improper manipulations of business records and other administrative malfeasance. The committee's mission was to save KVH "'and protect the Kiwanis name.'" CP at 3079. The committee found that no evidence showed that sexual abuse occurred at KVH. The committee issued a series of recommendations for KVH. Again, KPNW creating a committee that investigated KVH and issued recommendations is not evidence that KPNW had the right to control employment decisions at KVH, nor the treatment and supervision of residents. If the KPNW had such control, they may have issued binding resolutions on KVH, not mere recommendations.

In summary, none of these facts suggest that KPNW had the right to control the employment decisions at KVH, nor control the treatment or supervision of KVH residents. Unlike Kiwanis International, there is no evidence that KPNW could take action that would lead to the firing or forced resignation of employees or otherwise control the executive director. Nor is there evidence that KPNW could dissolve or otherwise close KVH. CC fails to show a genuine issue of material fact on this issue, and therefore, summary judgment was appropriate with respect to KPNW on the issue of actual agency.

3.  *The Local Clubs: Kiwanis of Tumwater, Kiwanis of Centralia-Chehalis, and Kiwanis of University Place*

We also hold that there are no genuine issues of material fact and the local clubs were entitled to judgment as a matter of law, therefore, summary judgment was proper as to the local clubs on the issue of actual agency.

CC argues that the local clubs manifested actual control over the KVH boards through the following: (1) local clubs provided support for the formation of KVH, including providing operational funding, (2) the Kiwanis Club of Centralia demanded KVH produce certain corporate documents, (3) Henry Meister discussed regaining control over KVH and ensuring it complied with the policies and rules of Kiwanis International, and (4) two local clubs withdrew their names from KVH's articles of incorporation and recommended that other local clubs do the same to be free from liability stemming from KVH operations.

First, while it is true that local Kiwanis clubs provided financial support as well as other material contributions, like clothes and food, the State provided the primary monetary support for KVH. Providing support does not demonstrate that the local Kiwanis clubs had the right to control the employment decisions or the treatment of residents at KVH. Second, while the Kiwanis Club of Centralia did demand KVH produce certain corporate documents, McCarthy refused to produce those documents. He stated that the request intruded into the responsibilities of the governing board—which is presumably the LCYE Board. Such evidence suggests that Kiwanis Club of Centralia did not have the right to control operational decisions at KVH—not the opposite.

At oral argument, CC stated that McCarthy's letter refusing to produce those documents provided, "I am controlled by the Board of Directors, which is appointed by all of the clubs. I answer to all of the clubs through that Board of Directors." Wash. App. Ct. oral argument, *supra.* But that letter actually provides, "There is a governing board for [KVH], . . . a board designated by the different Kiwanis Clubs sponsoring it's Boy's Home." CP at 3000.

McCarthy's letter does not suggest that he answers to the clubs through the LCYE Board. In the letter, he merely maintains that different local clubs designate members to be part of the governing board of KVH. The fact that local clubs put members on the governing board of KVH does not empower the local clubs to interfere with the operational decisions at KVH. Indeed, this letter cuts against CC's argument as it shows McCarthy refusing the Centralia Club's request for the information.

Third, it is true that Meister, a KVH Board member, talked about regaining control over KVH in a letter to the KVH Board. It is unclear how a letter to the KVH Board asserting that the KVH Board must regain control of KVH shows that the local clubs, in fact, had the right to control the operational decisions at KVH. Fourth, the Kiwanis Club of Chehalis and the Kiwanis Club of Tumwater withdrew their names from the KVH articles of incorporation. This withdrawal did not shut down KVH.

CC does not explain how local clubs withdrawing their names from the articles of incorporation shows that those clubs could have asserted operational control over KVH. Even when viewing this in the light most favorable to CC, the evidence does not demonstrate operational control. Viewing all of the aforementioned evidence in the light most favorable to

CC, we hold that there was not a genuine issue of material fact as to whether any of the local Kiwanis clubs had the right to control the relevant operational decisions at KVH.

In summary, there is a genuine issue of material fact precluding summary judgment on the issue of actual agency as to Kiwanis International, but not as to KPNW nor the local Kiwanis clubs.

B.      *Apparent Agency*

CC also argues that summary judgment was inappropriate because there was a genuine issue of material fact regarding whether KVH was the apparent agent of the Kiwanis Defendants. We agree as to Kiwanis International and the local clubs but disagree as to KPNW.

Under the apparent agency doctrine, vicarious liability may arise for the principal where the purported principal makes objective manifestations leading a third party to believe that the wrongdoer is an agent of the purported principal.[9] *FutureSelect*, 175 Wn. App. at 882.  The objective manifestations are sufficient if they "'cause the one claiming apparent authority'" to subjectively believe that the agent has authority to act for the principal and that the subjective belief is objectively reasonable.  *Mohr*, 172 Wn.2d at 860 (quoting *King*, 125 Wn.2d at 507). Lastly, the plaintiff must rely on that apparent agency relationship to their detriment.  *Wilson v. Grant*, 162 Wn. App. 731, 744, 258 P.3d 689 (2011); *D.L.S. v. Maybin*, 130 Wn. App. 94, 97, 121 P.3d 1210 (2005) (lack of evidence that DLS did anything in reliance upon a belief that she was employed by McDonald's, as opposed to another, defeated her apparent agency claim).

---

[9] "Manifestations to a third person can be made by the principal in person or through anyone else, including the agent, who has the principal's actual authority to make them—e.g., an advertisement in the newspaper, provided it is placed by the principal or an agent with actual authority." *Smith v. Hansen, Hansen & Johnson, Inc.*, 63 Wn. App. 355, 364, 818 P.2d 1127 (1991).

The principal's act of permitting the purported agent to use its name, advertising logo, and telephone were objective manifestations supporting an apparent agency relationship. *Hansen v. Horn Rapids O.R.V. Park*, 85 Wn. App. 424, 430, 932 P.2d 724 (1997).

1. *Manifestations and Belief*

CC argues that our focus should be on whether the Kiwanis Defendants made objective manifestations to the State—as opposed to CC—that caused the State to believe the Kiwanis Defendants were principals of KVH. CC points us to Illinois cases for the proposition that where the one claiming apparent agency was a minor at the relevant time, courts should look at the objective manifestations of the principal to the caretaker of the minor—in this case, the State. (Citing *Chicago Title & Tr. Co. v. Sisters of St. Mary*, 264 Ill. App. 3d 913, 917, 637 N.E.2d 543 (1994); *Monti v. Silver Cross Hosp.*, 262 Ill. App. 3d 503, 507, 637 N.E.2d 427 (1994) (determining whether the plaintiff met the reliance element by looking to whether the persons responsible for the care of the plaintiff in a medical context relied on the principal's manifestations)).

The Kiwanis Defendants contend that Washington case law is clear that we should look to the plaintiff's belief and reliance, not to whoever was in charge of caring for the minor plaintiff at the time. The Kiwanis Defendants also emphasize the purpose of apparent agency: "to protect third parties who justifiably rely upon the belief that another is the agent of a principal." *D.L.S.*, 130 Wn. App. at 97.

While we recognize Washington case law generally refers to the reliance of the party claiming apparent agency, *Mohr,* 172 Wn.2d at 860, Washington has not yet determined whether we may consider a minor plaintiff's caretaker's perspective to determine whether an apparent

agency relationship exists. If we were to agree with the Kiwanis Defendants, "no infant could ever hope to avail himself of apparent agency since he would be incapable of his own evaluation and reliance." *Nosbaum v. Martini*, 312 Ill. App. 3d 108, 121, 726 N.E.2d 84 (Ill. App. Ct. 2000). Such a determination would immunize principals from liability for leading a third-party caretaker to believe that they have an agency relationship with a wrongdoer. This would prevent minors and otherwise incompetent individuals, who could not meet the reliance element, from acquiring a remedy against a principal. Because CC did not have a choice in being placed at KVH, CC could not engage in evaluation and reliance and, under the Kiwanis Defendants' approach, would be foreclosed from availing himself of a cause of action based on apparent agency. Accordingly, in this context, we think justice demands we consider the entity who made the decision on CC's behalf—the State.

We turn first to whether there was a genuine issue of material fact regarding whether the State believed, based on Kiwanis Defendants' objective manifestations, that the Kiwanis Defendants were KVH's principal and whether the State relied on that belief. CC largely relies on Mark Redal's declaration to demonstrate a genuine issue of material fact on these issues.

Viewing the facts in the light most favorable to CC, we agree that Redal's declaration creates a genuine issue of material fact regarding whether Kiwanis International and the local clubs made objective manifestations that led the State to believe that Kiwanis International and the local clubs were the principals of KVH. For example, Redal's declaration established that Kiwanis International and local Kiwanis clubs met with State personnel to ensure the success of KVH as a state placement facility, which demonstrated to Redal that these Kiwanis entities "had more than a name-only interest." CP at 3433.

37

As to KPNW, DSHS staff periodically communicated with Kiwanis representatives, including KPNW. Such communication included an email wherein a DSHS employee endorsed KVH and its operation by McCarthy to KPNW. But even under the summary judgment standard, that statement does not amount to an objective manifestation that could reasonably lead the State to believe that the KVH Boards were the agents of KPNW. Thus, summary judgment was proper as to KPNW.

2. *Reliance*

We next analyze whether there was a genuine issue of material fact regarding whether the State relied on the belief that Kiwanis International and the local clubs were KVH's principals to the State's detriment.

Redal surmised that when DCFS decides which group homes to develop and support "[p]roposals with the backing of entities like Kiwanis probably had more potential to be developed as resources." CP at 1822. Redal also opined that "[t]he KVH connection to Kiwanis lent credibility to the group home, and a certain amount of assurance that additional support, oversight and even funding would be available to KVH. The fact that it was a Kiwanis-sponsored project, gave me the impression of stability and reliability." CP at 1822. To that end, Kiwanis International and local Kiwanis clubs met with State personnel to ensure that KVH was considered "a safe and reliable placement facility for wards of the State." CP at 3433.

Redal's statements create a reasonable inference that the State relied on the relationship between Kiwanis and KVH by referring children, like CC, to be placed at KVH because the State believed KVH had additional support, safety, oversight, funding, stability, and reliability because of its relationship with Kiwanis. Viewing this evidence in the light most favorable to CC, there

38

is a genuine issue of material fact regarding whether the State relied on the apparent agency relationship between Kiwanis International and the local clubs as principals and KVH as their agent to the State's detriment.[10]  Thus, summary judgment was improper as to Kiwanis International and the local clubs based on apparent agency.

### IV.  The ALTER EGO CLAIM IS AN IMPROPERLY ADDED CAUSE OF ACTION.

CC also argues that KVH was the Kiwanis Defendants' alter ego.  The Kiwanis Defendants respond that CC improperly raised this issue in response to the Kiwanis Defendants' summary judgment motion, and CC failed to include an alter ego theory in his complaint.  In response, CC argues that the Kiwanis Defendants failed to properly preserve their argument that the alter ego argument was improperly added.  We agree with the Kiwanis Defendants.

"A party who does not plead a cause of action or theory of recovery cannot finesse the issue by later inserting the theory into trial briefs and contending it was in the case all along." *Dewey v. Tacoma Sch. Dist. No. 10*, 95 Wn. App. 18, 26, 974 P.2d 847 (1999).  However, issues not raised by the pleadings may be tried by express or implied consent of the parties.  *Id*.

> In determining whether the parties impliedly tried an issue, an appellate court will consider the record as a whole, including whether the issue was mentioned before the trial and in opening arguments, the evidence on the issue admitted at the trial, and the legal and factual support for the trial court's conclusions regarding the issue.

*Id*.

---

[10] CC suggests that the State chose to rely on KVH's association with the Kiwanis Defendants by deluging it with referrals.  But the cited material merely provides "Because [KVH] . . . is unique in that it offers academic and vocational training on campus, caseworkers for the State of Washington deluged the Kiwanis program with referrals."  CP at 2648.  That does not suggest that the Kiwanis relationship caused such a deluge or whether the State treated KVH differently based on the Kiwanis relationship.

Here, CC raised his alter ego theory in opposition to the Kiwanis Defendants' motion for summary judgment. CC's sophisticated counsel did not move to amend the complaint to add the alter ego theory. CC does not point to any evidence that the alter ego theory was explicitly or implicitly tried by consent before the trial court. Simply inserting the theory into a response to summary judgment is insufficient to add a new cause of action. And CC points to no authority holding that a new cause of action is properly added in such a circumstance absent an objection from the opposing party. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."). Thus, we decline to consider this theory as a basis for reversing summary judgment.

CONCLUSION

In conclusion, we hold that RCW 23B.14.340 is a statute of repose but that it does not bar claims against the Kiwanis Defendants as a matter of law. We further hold that there is a genuine issue of material fact regarding whether an actual or apparent agency relationship between KVH and Kiwanis International existed, and whether an apparent agency relationship between KVH and the local clubs existed. We also hold that CC's alter ego argument is not properly before us. Accordingly, we affirm the grant of summary judgment as to KPNW. But we reverse the trial court's summary judgment order as to Kiwanis International and the local clubs and remand the matter for the trial court to conduct further proceedings consistent with this opinion.

No. 57207-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Glasgow, J.

Veljaci, A.C.J.